31626.  PHILLIPS, Commissioner, etc. *v.* SINCLAIR
REFINING COMPANY.

DECIDED OCTOBER 8, 1947.  REHEARING DENIED OCTOBER 30, 1947.

44

*Eugene Cook, Attorney-General, Claude Shaw, Assistant Attorney-General,* for plaintiff in error.

*Alston, Foster, Sibley & Miller,* contra.

FELTON, J. The several grounds of the amended motion concern only the questions raised by the general grounds and all will be treated generally.

As stated, the general demurrer to the petition for refund was overruled and no exception was taken to it. Therefore, if the taxpayer has proved his allegations, under the law of the case, he would be entitled to recover, even though the ruling was

erroneous for the reason that unless a taxpayer can show directly what profits accrued to it in the State of Georgia, and does not get permission to use a formula which he contends more accurately ascertains the profits realized in Georgia, he is only authorized to use the formula prescribed in Code, § 92-3113 (Ann. Supp.), and use it *as* prescribed. In this case the taxpayer used the formula but did not use it as prescribed. It included the refining business, which is not in Georgia, in the formula, but did not use the pipeline business or pipeline property. The ruling which this court made in *Mexican Petroleum Corp.* v. *Head,* 64 *Ga. App.* 529 (13 S. E. 2d, 887), has no bearing whatever on this case. That case simply holds that if profits in Georgia can be ascertained without the use of the formula, the formula cannot be used. It did not hold that where you cannot directly determine profits in Georgia you can use the formula by including only part of the total business of the taxpayer. It will be noted that the taxpayer does not rest its case on a substitute formula which it received permission to use in lieu of the statutory formula. It seems to have based its claim on a misconception of the case cited above and others of similar import.

■ The overruling of the demurrer eliminates all questions but one, and that is, did the taxpayer sustain by proof the allegations of the petition for refund? Paragraph 17 of the petition alleged: "Neither the cost price to petitioner of the petroleum products which it markets, nor the selling price thereof, nor the profits realized from their sale, whether in Georgia or elsewhere, are affected, directly or indirectly, by the fact that petitioner carries on the business of transporting crude oil under filed tariffs. The two businesses are entirely disconnected." The ruling on the demurrer poses a distinct issue; if the pipeline business is separate and distinct the taxpayer is authorized to include two out of three of the phases of business in which it is engaged instead of all as required by the statute; if it is not separate and distinct it was not authorized to use the formula as it did and was not entitled to a refund. We think the evidence fails to show that the whole business of the taxpayer was not unitary in character and fails to show that the pipeline department was separate and distinct. The fact that the taxpayer owned a pipeline and transported oil for the public under

rates filed by the taxpayer with the Interstate Commerce Commission, and transported oil to its own refineries for the owners of the oil and collected transportation charges from the owners of the oil is not conclusive. The taxpayer may well be said to have known in advance what oil it would purchase. The plan adopted amounted to no more than the taxpayer's purchasing the oil at the well, transporting it, and paying itself the transportation charges. The transportation charge is a part of the cost of the oil at the refinery and the cost of the finished product at the retail outlet. The argument that the transportation cost to the taxpayer forms a part of the cost price of the finished product when it transports oil which it buys just as much as it would if the taxpayer paid the transportation to a third party is fallacious because one entity cannot say that a nine million dollar profit on transportation is cost of goods sold by it. If it made a profit of nine million dollars, the cost to it was not nine million dollars. The fact that if Sinclair had transported oil for third parties, none of which it bought and refined and sold, the pipeline business could have been a unitary business, does not alter the unescapable conclusion that the pipeline was not a unitary business under the facts of this case. If it had not bought and refined and sold any of the oil which it transported through its pipelines, then the question whether the cost of such transportation entered into the cost of products sold in Georgia would not be involved. Moreover, the very fact of owning refineries and sales outlets was responsible for the large profits in transportation even if Sinclair could have made the same profit hauling oil for others which it did not purchase. On this point Mr. Wagon, Assistant Comptroller, testified on cross-examination: "It is true that the Sinclair Refining Corporation would not carry or purchase 72.69% of all the oil transported over the pipeline unless it had manufacturing and retail outlets over the country. Likewise, it would not make that profit unless it kept the pipeline running at full speed for some shipper. However, begin a public utility we carried oil for all shippers who desired our services in 1941 and the figure shows that only something like 27% of the amount of oil carried was transported for private shippers. It is necessary for us to have retail outlets in order for the pipeline to make the nine and one-fourth million dollars

net profit or conversely, it is necessary to have the pipeline in order to be able to supply the retail outlets. We have to have retail outlets in order to make a profit since our profit eventually is made by selling merchandise to the public. It is necessary to have retail outlets in order to make this profit. . . Q. Therefore, the fact that you had an outlet or where you could dispose of 72 percent of the crude oil shipped over that pipeline, therefore, necessarily greatly increased the profit of the pipeline department? A. It is well known, Mr. Shaw, that particularly with respect to pipeline operations that you get a bigger percentage of return net to gross the higher you put the capacity of the line; your expense don't increase so greatly even though your volume does." The fact that for every dollar of pipeline income 48.83% was profit, while for every dollar of income from manufacturing and sales 1.30% was profit, and the fact that the taxpayer received 46.82% return on its investment on pipeline properties and .02% on manufacturing and sales in vestment shows the disparity between the profits credited to the various departments. The taxpayer does not propose to suggest what would be a reasonable profit to be credited to the pipeline department in order to show an excessive tax laid on business outside of Georgia. If the taxpayer could have and did own a private pipeline or other transportation system and saved nine million dollars as transportation charges, it certainly could not add that savings to the cost of goods sold. In this case the basic enterprise is manufacturing and selling and profits are captured in sales. The three departments insofar as oil transported and sold is concerned are of one cloth and cannot be separated in an income-tax return which requires the use of a formula. The proof does not sustain the allegation of separateness of businesses of the pipeline department and no evidence shows that the formula is arbitrary, unreasonable, or for any reason unjust as applied to this taxpayer. No shifting of profits was involved in the case of Hans Rees' Sons v. North Carolina, 283 U. S. 123 (51 Sup. Ct. 385, 75 L. ed. 879). That case, as well as nearly all the others cited bearing on the question, conceded that ordinarily a corporation which manufactures and sells its manufactured product is a unitary business and that all the factors in the enterprise are essential to the realization of

profits. In that case it was simply held that a formula could not be employed which showed that about 80% of a taxpayer's total income came from business done in a certain State, when the evidence showed that the average income having its source in that State was 17% of the total for the year in question. It holds also that even if the business is unitary in character the use of a formula, not intrinsically arbitrary, cannot grossly over-tax business done outside a state.

Underwood Typewriter Co. *v.* Chamberlain, 254 U. S. 113 (41 Sup. Ct. 45, 65 L. ed. 165), treats such a business as is here involved, namely, manufacturing and selling, as a unitary business. The same is true of Maxwell *v.* Kent-Coffey Co., 204 N. C. 365 (168 S. E. 397). In that case the court said: "Conceding that a unitary business may produce an income which must be allocated to two or more States in which its activities are carried on, such a business may not be split up arbitrarily and conventionally in applying the tax laws. It would seem to be necessary that there should be some logical reference to the production of income; the distinction should be founded on a corresponding difference in apportionment of productive capital, investment, or employment, within the unitary business. . . The mere statement of a witness as to the income separately derived from purchase, from manufacture, and from sale, without supporting data, showing the influence of each factor in producing profit, gain or income from the separate operations—such as should be allocated to it independently—is merely an arbitrary guess. The bare fact of sale produces no income. It is merely the act by which the income is captured; the capital, the organization, or efforts which produce the sale, are the things to be considered in ascertaining the amount of income to be credited to the sale. Certainly, in a unitary business, we must look further back than to the sale itself or the activities which actually produced it."

Other cases are cited by the taxpayer in line with the Georgia case of *Mexican Petroleum Corporation* v. *Head*, supra, to the effect that "theories of allocation can have no place in the inquiry, if net income within the State stands on its own footing unmixed with outside business." These cases have no bearing on this case because the taxpayer could not separate the Georgia

profits and it used the formula improperly. Under the ruling on the general demurrer the taxpayer could use the formula as it did provided it proved the business to be not a unitary business as a whole, and proved the pipeline department itself and alone a unitary business. This we have held it did not do. We do not mean to say that it is not possible for one corporation to engage in two businesses, even manufacturing and selling, as separate businesses. We simply hold that the taxpayer was not so engaged under the facts of this case.

In view of this ruling it is unnecessary to rule in detail on the various findings of the court below. As a finding against the taxpayer was demanded under the law and the evidence, it is unnecessary to make any rulings on any of the other questions presented.

The court erred in favor of the refund and in overruling the motion for a new trial.

Pursuant to the act of the General Assembly, approved March 8, 1945 (Ga. L. 1945, p. 232), requiring that the whole court consider any case in which one of the judges of a division may dissent, this case was considered and decided by the court as a whole.

*Judgment reversed. MacIntyre, P. J., and Gardner and Townsend, JJ., concur. Parker, J., concurs specially. Sutton C. J., dissents.*

PARKER, J., concurring specially. The record shows that the taxpayer's net income for the calendar year 1941 from its pipeline department was substantially more than $9,000,000, while the rest of its income for that year derived from its manufacturing and marketing operations was slightly in excess of $3,-000,000; and that the net income from the pipeline department was excluded by the taxpayer in arriving at the net business income subject to apportionment to Georgia.

The business of the taxpayer was transporting, refining and marketing crude oil and petroleum products. The showing that the taxpayer was transporting and refining crude petroleum products, and then selling them to the general public, all being done by the same corporation as the common owner, where each division or department of the whole enterprise enjoys benefits from the others, establishes more than a mere *unity of ownership.*

The three businesses, if each may be described as a business, although distributed throughout different states, are united in a single specific use as stated in Adams Express Co. *v*. Ohio, 165 U. S. 194 (17 Sup. Ct. 305, 41 L. ed. 683), a case cited and relied on by the taxpayer. Transporting the crude products to the refineries is the first step, refining these products is the second step, and selling them to the ultimate consumer is the final goal towards which the first two steps in the operation are directed. The property and business of the taxpayer, although located in different States, whether devoted to transporting, refining or selling, is united under one ownership in one specific use, namely, the supplying of petroleum products to the consuming public. The character and kindred nature and necessities of the business make this so.

The evidence shows that the taxpayer could not have made its aggregate profits in 1941 without engaging in all three of the activities involved in the entire operation, and its own witness testified that the transportation (which was the business of the pipeline department) was an essential part of the business of the taxpayer. Mr. Wagon, assistant comptroller of Sinclair Refining Company, testified in part as follows: "The Sinclair Refining Company is engaged in three phases of business; first, the pipeline business which it uses to transport crude oil to some of its refineries; secondly, the refining of crude oil; and third, the marketing of petroleum products. The Sinclair Refining Company could not have made the aggregate profit which it did in 1941 without engaging in all three of these activities. The transportation of crude oil was an essential part of the business of the Sinclair Refining Company in 1941." It seems to me that the whole enterprise, under the record before this court, was a unitary business, its several departments joined in one ownership and each department deriving some advantage from the common ownership.

Furthermore, it appears from the evidence that certain expenses in the operation of the pipeline were charged against the income of the other two departments of the corporation, that is, to refining and marketing. This appears in officer's salaries, general administrative expenses, and in capital stock taxes amounting to $288,000 which were paid to the Federal Government.

I think that the taxpayer failed to carry the burden of showing that the business was not of a unitary character, and failed also to show that it had overpaid the taxes due the State of Georgia. For these reasons, in addition to those stated by Judge Felton, I concur in the judgment of reversal.

SUTTON, C. J., dissenting. This is a suit by the Sinclair Refining Company against the State Revenue Commissioner to recover income taxes alleged to have been illegally assessed and collected by the commissioner from this company for the year 1941. During the period in question the Sinclair Refining Company was engaged only in the business of marketing petroleum products in the State of Georgia. It owned refineries in other States and was engaged in refining and marketing crude and refined petroleum products in those States. It also owned pipelines located in a number of States (but not in Georgia) wherein crude oil was shipped by dealers to refineries owned by the Sinclair Company and other oil companies, and the shipper paid the cost of the transportation of the oil through said pipelines. Prior to August, 1936, these pipelines were owned and operated by a different corporation, the Sinclair Prairie Pipeline Company, which was engaged in the business of transporting crude oil, as a common carrier, by and through the system of pipe lines. Its principal office and headquarters were located in Independence, Kansas, where it kept its books and records and from which place it carried on and directed its business. It had no pipe lines in Georgia, did not transport any oil into or through this State, nor did it do any business of any sort in Georgia.

On August 31, 1936, the Prairie Company and Sinclair Company merged into a single corporation under the name "Sinclair Refining Company" (now the petitioner), but the business of transporting crude oil, being the business theretofore engaged in by the Prairie Company, was carried on and operated thereafter by the Sinclair Company as an autonomous department of the merged corporation, and as so conducted will hereafter be referred to as the "Pipeline Department" or the "Department."

The Pipeline Department is carried on, managed and directed from offices at Independence, Kansas. It has no offices, agents or places of business in Georgia, and directions relative to the transportation of crude oil by pipeline neither originate, nor are they carried out, in Georgia.

As was the case with its predecessor, the Prairie Company, the Pipeline Department, as such, is a common carrier under the Interstate Commerce Act (Title 49, § 1 (3), U.S.C.A.), and also under the laws of the States where it operates.

The Pipeline Department, as such, files and publishes its tariffs covering its transportation charges with the Interstate Commerce Commission and with the different State bodies in the several States where it has pipelines.

The valuations of the Pipeline Department's property are those put upon it by the Interstate Commerce Commission, and are fixed by the Commission. It keeps its own books and records in accordance with the regulations of the Commission imposed upon it as a carrier subject to the Commission's orders. These books and records are kept at Independence, Kansas. The general books of Sinclair Company are kept in the City of New York. No books, records or other documents pertaining to the business of the Pipeline Department are kept in Georgia.

It is not necessary, in order to determine the profits of the Pipeline Department, to refer to any books or records kept in Georgia or elsewhere than at Independence, Kansas, since the Department's books must, under the rules of the Interstate Commerce Commission be so kept that its, the Department's, profits can be determined therefrom without reference to the general books and records of Sinclair Company.

The revenues of the Pipeline Department are solely those which it obtains from the furnishing of transportation of crude oil as a common carrier, under filed tariffs. In 1941 Sinclair Company received 72.69% of the crude oil thus transported and other refineries received 27.31%.

Sinclair Company has no refineries in the State of Georgia.

Sinclair Company neither has, nor does it operate, any pipelines other than those operated by the Pipeline Department in the manner herein set out. None of these pipelines is in the State of Georgia, being located in the States of Wyoming, Texas, Oklahoma, Kansas, Missouri, Iowa, Illinois and Indiana.

In the State of Georgia Sinclair Company is, and in 1941 was, engaged in the business of marketing petroleum products. Outside of the State of Georgia Sinclair Company is, and during the year 1941 was, engaged in (1) the business of the refining

54

and marketing of crude petroleum and petroleum products, and (2) the business of transporting crude oil by pipeline in, into and through the States heretofore enumerated.

The controlling question for determination, under the record as here presented, is whether or not the Sinclair Refining Company maintained and operated the "Pipeline Department" as a separate, distinct and autonomous unit of its business from that of its business of refining and marketing crude and refined petroleum products inside and outside the State of Georgia. If the Pipeline Department business was operated by the Sinclair Company as a separate and distinct unit or business from that of its business of refining and marketing petroleum products, then no part of the net income of the Pipeline Department was subject to income tax in Georgia, under the law.

The material parts of the plaintiff's petition are set out in the statement of facts preceding Judge Felton's opinion; also, the agreed statement of facts and part of the evidence will be found there. It has been adjudicated on demurrer that the plaintiff's petition set out a cause of action for a refund, and that judgment was not excepted to. I am of the opinion that the admitted portions of the petition, the agreed statement of facts and the evidence sustain the plaintiff's case as made by the petition.

The Code (Ann.), provides, in part: "The tax imposed by this law shall apply to the entire net income, as defined herein, received by every domestic corporation and every foreign corporation owning property or doing business in this State:

"If the entire business income of the corporation is derived from property owned or business done in the State, the tax shall be imposed on the entire business income, but if the business income of the corporation is derived in part from property owned or business done in the State and in part from property owned or business done without the State, the tax shall be imposed only on the portion of the business income reasonably attributable to the property owned and business done within the State, to be determined as follows." See § 92-3113, and the factor ratios therein set out.

As I understand, the Revenue Commissioner used the Three Factor Ratio in making the assessment against the Sinclair Re-

fining Company and thereby taxed income derived from the operations of the Pipeline Department of the taxpayer, along with its refining and sales business. The case of *Mexican Petroleum Corp.* v. *Head,* 64 *Ga. App.* 529 (supra), is somewhat similar to this case. The first headnote in that case is as follows: "The formula provided in the Code, § 92-3113 (3c), as to computing income tax upon the income earned in Georgia of a resident corporation, where the corporation receives an income from business done both within the State of Georgia and without the State of Georgia, is not applicable, under the facts of this case, where the business done by the corporation within this State is separate and distinct from that done without the State, and is carried on as a separate and distinct business from the business done without this State, and the income derived from the business done within this State is ascertainable from the records of the business and transactions of the business carried on within this State." And on page 535 of the opinion in the same case, the court said: "There are some corporations which from their very nature produce an income which can not be properly allocated by separate accounting methods, but that is not the case with the manufacture and sales business, particularly so where the accounts of such operations are so kept as to be readily separable. The theories of allocation can have no place in the inquiry if the net income within the State stands on its own footing unmixed with outside business. So, properly construing the income-tax act of 1931, where a part of the income of a domestic corporation is derived solely and exclusively from business done by it without this State, . . and is carried on through an office maintained by the corporation without this State, and in producing such income no property of the corporation within this State is used, it is our opinion that the formula provided in section 15 (3c) supra of act of 1931 for the allocation of corporate net income for income taxation, is not applicable. It is not the purpose and intent of the act to tax the net income of a domestic corporation derived from property owned or business done outside the State. Under the circumstances here it was not within the discretion of the commissioner to apply the formula which was applied." Under the facts, the Three Factor Ratio was inapplicable in the present case, in my opinion.

The fact that the Pipeline Department was owned by Sinclair Refining Company does not necessarily mean that the income derived from the transportation of petroleum products in its pipelines, located outside of Georgia, can be legally taxed in Georgia. If the Pipeline Department was operated as a separate and distinct business unit from that of the business of marketing petroleum products in Georgia and that of refining- and marketing such products in other States by the Sinclair Refining Company, then under the record here the income derived by the taxpayer from its pipeline business is not subject to be taxed in this State.

But it is contended on the other hand that the transportation of the crude petroleum products to the refineries, refining these products and then marketing them constituted a unitary business. I do not believe this contention can be legally sustained under the record of this case. As above stated, the mere unity of ownership is not sufficient in itself to make it a unitary business. See, in this connection, Adams Express Company *v*. Ohio, 165 U. S. 194 (supra); Underwood Typewriter Company *v*. Chamberlain, 254 U. S. 113 (supra); Hans Rees' Sons *v*. North Carolina (supra). Prior to August, 1936, these pipelines were owned and operated by a different corporation, Sinclair Prairie Pipeline Company, as a common carrier in transporting crude oil. Its tariffs were fixed by the Interstate Commerce Commission and it was operated as an independent business and, of course, received its own income; and since its merger with the Sinclair Company in 1936, it has been known as the Pipeline Department and has been operated as a separate and distinct business unit of the Sinclair Refining Company and in the same manner that it was operated before the merger. It was not unitary with the refining and marketing business before the merger and, under this record, it seems to me that it was not unitary with such businesses in the taxable year of 1941.

The business of transporting oil through these pipelines was maintained as an independent business and was capable of earning a profit as such before the merger in 1936; it could be, and was, carried on in the same manner after the merger; and it could now be operated as an independent business by Sinclair, if Sinclair were to retire from the refining and marketing of

petroleum products. In other words, it is capable of being carried on as a separate and distinct business. See Maxwell *v.* Kent Coffey Manufacturing Co., 204 N. C. 365 (supra).

I believe that the judgment in favor of the plaintiff, which was rendered by the trial judge without the intervention of a jury, should be affirmed.