21049

EXXON CORPORATION, Appellant, v. SOUTH CAROLINA TAX
COMMISSION, Respondent.

(258 S. E. (2d) 93)

*Charles W. Knowlton, J. Donald Dial, Jr.,* and *George S. King, Jr.,* of *Boyd, Knowlton, Tate & Finlay,* Columbia, *Lloyd M. McBride* and *Paul D. Frenz, McBride, Baker, Wienke & Schlosser,* Chicago, Ill., and *Joseph O. Luby, Jr.,* of *Exxon, U. S. A.,* Houston, Tex., *for appellant.*

*Atty. Gen., Daniel R. McLeod, Deputy Atty. Gen., Joe L. Allen, Jr., Sr. Asst. Atty. Gen., G. Lewis Argoe, Jr.,* and *Asst. Atty. Gen., John C. von Lehe,* Columbia, *for respondent.*

September 5, 1979.

*Per Curiam:*

We are of the opinion that the order of Judge Moss properly sets forth and disposes of all issues raised by this appeal. His order, with deletions as indicated, will be printed as the opinion of this court. The matters included in brackets are our own.

## ORDER OF HONORABLE JOSEPH R. MOSS

This action was brought pursuant to Section 12-47-220 for a refund of $1,720,718.10 income taxes with interest paid under protest. The taxes were assessed on income generated by Humble Oil and Refining Company (Humble). During the years in question, 1970, 1971 and 1972, Humble was a wholly-owned subsidiary of Standard Oil Company of

New Jersey (Standard Oil). Standard Oil was an international petroleum company. In contrast to its parent, Humble's activities were primarily domestic. It was engaged in the exploration and production of crude oil and natural gas, in the refining of crude oil and in the sale of petroleum products. Such a combination of activities is often referred to as vertical integration. Humble operated in this State under the trade name of Esso. The present corporate structure came about after the years in question when Humble was merged into Standard Oil which had changed its name to Exxon.

For the years in question, Humble reported its income to this State under a method which excluded from the tax base that portion of its corporate income assigned by the company to its exploration and production activities. Humble reported its income as follows:

|      | A | B | A-B (with Adjustments) |
|------|-----------|----------------|-----------------|
|      | Net Income of the Corporation | Assigned to Exploration and Production | Income to Which S. C. Ratio Applied |
| 1970 | $573,910,020 | $474,486,034 | $ 75,399,694 |
| 1971 | 679,525,217 | 533,854,718 | 110,123,128 |
| 1972 | 624,911,477 | 549,259,522 | 34,647,726 |

On audit the exclusion of the amount assigned to exploration and production activities was disallowed and Humble's liability was computed by applying the South Carolina apportionment ratio to the net income of the corporation less certain minor items which were specifically allocated. The basic question is therefore whether or not the Tax Commission acted properly in applying the apportionment ratio to Humble's corporate income in arriving at a tax base, or whether the ratio should have been applied, as the plaintiff contends,

to a lesser amount derived by excluding that portion assigned by Humble to its exploration and production activities. In my opinion the method employed by the defendant Tax Commission is in accordance with the income tax laws of this State and does not violate any constitutional provision. For the reasons which follow, I have determined that the tax in question was properly assessed and collected and that no refund should be granted.

The taxes in question are imposed by Sections 12-7-230 and 12-7-250 of the 1976 South Carolina Code of Laws. Section 12-7-250 states:

"If [a] taxpayer * * * is transacting or conducting his business partly within and partly without this State, the income tax * * * shall be imposed upon a base which reasonably represents the proportion of the trade or business carried on within this State."

A taxpayer may, of course, operate more than one business. If a single corporation operates two or more "unrelated businesses" within its corporate shell, the Tax Commission seeks to apportion and tax only the income from the business that operates in this State. The Commission Regulation follows:

"117-87.17 UNRELATED BUSINESS—The phrase 'transacting or conducting his business partly within and partly without the State of South Carolina' * * *, is applicable to a single business operation, which is unitary or homogenous and is carried on both within and without the State. * * *. A Taxpayer operating a unitary or homogenous business within and without the State and an unrelated business either entirely within or without shall be subject to the allocation formulas with respect to the unitary or homogenous business but not with respect to the unrelated business. The income from the unrelated business shall be directly assignable to the state where such business is conducted."

Humble argues that its exploration and production activities comprise an "unrelated business" and that the income

allocated by it to those activities should be directly assigned to the states where such activities are conducted. The defendant Tax Commission on the other hand contends that Humble's exploration and production activities are a part of the company's "single business operation which is unitary" and has therefore refused to allow the plaintiff to reduce its apportionable income by the amount assigned by Humble to its exploration and production activities.

The leading case on the meaning of the term "unitary" as it is used in the area of state taxation of multistate businesses is *Butler Brothers v. McColgan,* 315 U. S. 501, 62 S. Ct. 701, 86 L. Ed. 991. The concept applied in the *Butler Brothers* decision has become known as the "unities" definition. The Supreme Court spoke of "unity of use and management". The California decision which it was affirming had used as its definition unity of ownership, unity of management and unity of operation. See *Butler Brothers v. Mc-Colgan,* 17 Cal. (2d) 664, 111 P. (2d) 334 (1942).

In the Supreme Court decision (pages 509 of 315 U. S. at 705 of 62 S. Ct.), the Court spoke of the "contribution" of the California operations to the business as a whole. It had already addressed the benefits derived by the California operation from the company's business without the state. This interaction of contribution and/or dependence has evolved into the "contribution-dependence" definition which has been used by nearly all state courts that have considered the question of whether or not a business is unitary. Among the states applying the contribution-dependence test are Kansas, Minnesota, Montana, Oklahoma, Oregon, Utah, Virginia and Wisconsin.

\* \* \* \* \*

The "unities" concept and the "contribution-dependence" test are by no means mutually exclusive. In the decision cited above, the courts have often applied both definitions in deciding whether or not a business is unitary in nature. The origins of both definitions may be traced to the *Butler Broth-*

*ers* decision and the activities of a corporation which exhibit unity of ownership, management and operation have usually been found to be activities which are contributory or dependent upon one another.

The South Carolina Supreme Court has not been faced with the question of whether or not a particular business is unitary in nature. A recent case has, however, commented on the term. In *Covington Fabrics v. South Carolina Tax Commission,* 264 S. C. 59, 212 S. E. (2d) 574, appeal dismissed 423 U. S. 805, 96 S. Ct. 14, 46 L. Ed. (2d) 26 (1975), our Court said:

"It is conceded that the business is unitary in nature, therefore its income is attributable to all incidents of the business and not to any single activity."

The Court then quoted a portion, but not all, of the definition used by the North Carolina Court in *State Ex rel. Maxwell v. Kent Coffey Manufacturing Co.,* 204 N. C. 365, 168 S. E. 397, affirmed, 291 U. S. 642, 54 S. Ct. 437, 78 L. Ed. 1040 (1933).

"That term [unitary] is simply descriptive, and primarily means that the concern to which it is applied is carrying on one kind of business—a business, the component parts of which are too closely connected and necessary to each other to justify division or separate consideration, as independent units."

The South Carolina Court did not quote the additional language of the decision which is relied on by Humble, *i. e.,* whether or not the activities sought to be separated are "capable of producing a profit in and of themselves". We did not adopt as our definition the language that the activities of a business are not unitary if they "might be maintained as an independent business (however convenient and profitable it may be to operate them cojointly)". This language lends itself to a definition of unitary in terms of essentiality. Following such a definition, tests of contribution or

dependence as well as unity of ownership, management and operation would be irrelevant. In my opinion, a definition of unitary based on whether or not the segments sought to be separated are essential to one another so that one could not be operated without the other, no matter what benefits in the form of cost savings or additional revenues are lost by the separation, is not in conformity with the *Butler Brothers* decision. A California Supreme Court case is directly on point. In *Superior Oil Company v. Franchise Tax Board,* 60 Cal. (2d) 406, 34 Cal. Rptr. 545, 386 P. (2d) 33 (1963), the tax collector wanted to separate the company's California production operations and not treat the company as a unitary business. *Superior* was primarily a producing company with wells in California and other states. It refined only a minor portion of its production and most of Superior's crude was sold at the wellhead. The Court held that the company operated a "unitary business" as that term is defined in the *Butler Brothers* case, *i. e.,* (1) unity of ownership, (2) unity of operation and, (3) unity of use. It then quoted the contribution-dependence test. The Court went on to specifically reject the "necessary and essential" test now proposed by Humble. In describing the *Butler Brothers* rule, it said:

"In [the Supreme Court's] view the test was not one based on essential activities, but rather one based on contributing activities * * *."

In my opinion, the proper answer to the question of whether or not a business is unitary in nature is given in terms of whether or not the business possesses the characteristics of unity of ownership, unity of management and unity of operation and whether or not the activities of the business in question contribute to or depend on the other activities of the business.

[Here Judge Moss sets forth in detail a factual analysis of the overall operations of Humble, particularly as related

to the interdependence of its several departments. His findings of fact from such analysis are recapitulated below.]

A recapitulation of the facts concerning Humble is: (1) Humble held itself out to the public as one company. It made no attempt to externally identify its exploration and production activities as a separate business. (2) The company employed central staff services upon which all departments were dependent. (3) Humble used centralized purchasing techniques which produced savings throughout the company. (4) Strong centralized management was employed over all segments of the company. (5) The combination of the various activities within a single corporation was beneficial to Humble in that it provided profit stability, reduced risk and insured full capacity utilization of the company's facilities. (6) Humble's crude production and crude sales made crude purchases available for its refineries. (7) High-level personnel within the various departments were selected by upper management, not by departmental vice presidents, and the movement of personnel throughout the company was a beneficial practice employed by Humble. The combination of the various functions created a pool or source of talent which otherwise would not have been available. (8) A central source of earnings and funds was employed and no attempt was made to segregate accumulated earnings or funds based on the company's internal assignment of earnings to these functions. (9) Based on the company's internal assignment of earnings and assets to the various functions, refining and marketing were dependent upon the company as a whole during the years in question. Had the functions not been combined, an additional cost of capital would have existed because of the necessity for borrowed funds. This cost was averted because of the vertical integration of the company. (10) The various operating activities of exploration and production, refining and marketing both contributed to and depended on each other.

In my opinion Humble, during the years in question, ■ was a single unitary business comprised of the exploration and production of crude oil and natural gas, the refining of crude oil and the marketing of natural gas and refined petroleum products. The corporation possessed the characteristics of unity of ownership, unity of management and unity of operation, and the activities of E & P, refining and marketing all contributed to and depended upon each other.

## SOUTH CAROLINA ACTIVITIES

Humble's gasoline and oil were sold in this State during the years in question under the trade name "Esso", a name which the company or its predecessors had used here for over thirty (30) continuous years. Humble had approximately thirteen hundred (1,300) gasoline stations in this State, many of which were uniformly designed and constructed by the company in order to promote the sale of its branded gasoline.

Gasoline came into South Carolina from two sources, pipeline and tanker. Humble's tankers continuously used the port of Charleston. At Charleston the company owned and operated a massive facility described as a "terminal". This "terminal" included a product blending operation, a motor oil canning facility and an asphalt plant. The terminal was housed on approximately one hundred ninety (190) contiguous acres of land. (Photographs of the facility are in the record.) Additionally, Humble owned and occupied at Charleston about twenty (20) other lots or parcels of improved realty. Products blended and canned at the Charleston terminal were distributed and sold in neighboring states.

\* \* \* \* \*

Having found that the major operating activities of Humble, consisting of E & P, refining and marketing, constituted one unitary business, [and that Humble's South Carolina activities during the years in question were substantial] it is

next necessary to examine the plaintiff's other contentions. The plaintiff has argued that extraterritorial values are being reached and that because of severance taxes levied by numerous oil producing states it is being subjected to multiple taxation.

With regard to the overreach allegation which raises arguments based both on the Due Process Clause and the Commerce Clause of the United States Constitution, our Court stated in *Covington Fabrics* decision, *supra*:

"We have not found a case that supports the corporation's contention that the application of a three factor formula unreasonably apportions income, nor has one been called to our attention. The formula has however been considered and approved as a reasonable basis for apportioning income. The Supreme Court of the United States, in the case of *Butler Bros. v. McColgan, supra,* held that:

'We cannot say that property, payroll, and sales are inappropriate ingredients of an apportionment formula. We agree with the Supreme Court of California that these factors *may properly be deemed to reflect "the relative contribution of the activities in the various states to the production of the total unitary income,"* so as to allocate to California its just proportion of the profits earned by the appellant from this unitary business.' (Emphasis added.)"

As stated earlier, Humble transferred a majority of its crude (both produced and purchased) to its refineries. The income computed for E & P was therefore based primarily on transfer prices rather than on actual sales to third parties. This transfer pricing was referred to by Humble's expert accounting witness as "unrealized income". He stated that he would not give an unqualified opinion as to the accuracy of the exploration and production income because the sales were not made to third parties. The defendant Tax Commission has cited authority from the Georgia courts which holds that the transfer pricing rather

than sales to third parties cannot be used by a multistate corporation in computing divisional income. See *Phillips v. Sinclair Refining Co.,* 76 Ga. App. 34, 44 S. E. (2d) 671 (1947). I find the reasoning of the Georgia case persuasive. It is in line with the conclusion reached by the United States Supreme Court in *Bass, Ratcliff & Gretton v. State Tax Commission,* 266 U. S. 271, 45 S. Ct. 82, 69 L. Ed. 282, which held that the unitary business in question there earned no profits until actual sales of its products were made. See also *Northwestern States Portland Cement Co. v. Minnesota,* 358 U. S. 450, 79 S. Ct. 357, 3 L. Ed. (2d) 421, which quotes the same language at page 461 and 363 of 79 S. Ct. Reports. However, under the *Butler Brothers* decision, it is not necessary to impeach Humble's accounting system. The Court stated:

"It is true that appellant's separate accounting system for its San Francisco branch attributed no net income to California. But we need not impeach the integrity of that accounting system to say that it does not prove appellant's assertion that extraterritorial values are being taxed. Accounting practices for income statements may vary considerably according to the problem at hand. * * * A particular accounting system, though useful or necessary as a business aid, may not fit the different requirements when a State seeks to tax values created by business within its borders. * * *."

The plaintiff has placed strong reliance on the case of *Hans Rees' Sons, Inc. v. North Carolina,* 283 U. S. 123, 51 S. Ct. 385, 75 L. Ed. 879, decided in 1931, ten years prior to the *Butler Brothers* decision. In *Hans Rees* the Supreme Court reversed a decision of the North Carolina Court which had refused to allow the introduction into evidence of proof of the multistate business's earnings in that state. The corporation's activities in North Carolina consisted of manufacturing and the state's archaic income tax apportionment formula which utilized only a single property factor had apportioned over eighty (80%) percent of the company's in-

come there in three years of the four in question. The company had offered evidence to show that only seventeen (17%) percent of its income was earned in North Carolina. The Court stated of the formula applied:

"For the present purpose, in determining the validity of the statutory method as applied to the appellant, it is not necessary to review the evidence in detail, or to determine as a matter of fact the precise part of the income which should be regarded as attributable to the business conducted in North Carolina. It is sufficient to say that, in any aspect of the evidence, and upon the assumption made by the state court with respect to the facts shown, the statutory method, as applied to the appellant's business for the years in question operated unreasonably and arbitrarily, in attributing to North Carolina a percentage of income out of all appropriate proportion to the business transacted by the appellant in that state. In this view, the taxes laid were beyond the state's authority. * * *."

The *Hans Rees* decision may be distinguished from the later *Butler Brothers* case on the ground that the California formula of property, payroll and sales more accurately measured the contribution of *Butler Brothers'* California activities to the corporation's unitary income. South Carolina has employed a formula based on these three principles. If *Hans Rees* cannot be distinguished from *Butler Brothers,* the later decision of course controls.

The plaintiff has also relied on the Minnesota decision of *Skelly Oil Company v. Commissioner,* 269 Minn. 351, 131 N. W. (2d) 632 (1964). I do not find that case persuasive. It is not, in my opinion, in line with the *Butler Brothers* case or the great weight of authority throughout the country which has stemmed from the *Butler Brothers* decision. The *Skelly* decision is perhaps distinguishable based on the fact that *Skelly* proved that only nine (9%) percent of the crude oil it produced was used in its refineries thereby giving the Minnesota Court at least some basis upon which to affirm

the Lower Court's fact finding that the production activities of the corporation formed a business that was separate from the refining and marketing functions. Furthermore, the interdependence found to be lacking in *Skelly* was present in Humble. In *Skelly*, the Lower Court had found that decisions about exploration and production, such as where, when and in what volume the oil was to be produced, were decided entirely by the departments in charge of those activities without regard to the needs of *Skelly's* refineries or markets. Based on the record before me, this was certainly not the case with Humble. Also, *Skelly* apparently had no supply department because no need existed to coordinate its production department with the rest of the company. Such a need obviously existed at Humble.

A court's primary concern in the due process area is not to improvise a method for computing taxes, but to inquire as to whether or not the method provided imposes a tax which bears a reasonable relationship to the taxpayer's activities in this State. As stated in the case of *Wisconsin v. J. C. Penney Co.*, 311 U. S. 435, 61 S. Ct. 246, page 250, 85 L. Ed. 267 (1940) :

"* * *. That test [due process] is whether property was taken without due process of law, or, if paraphrase we must, whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return. The substantial privilege of carrying on business in Wisconsin, which has here been given, clearly supports the tax, and the state has not given the less merely because it has conditioned the demand of the exaction upon happenings outside its own borders. The fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction. * * *."

The South Carolina activities of Humble were substantial particularly when viewed with reference to the massive Charleston facility. The Due Process Clause is satisfied in that the tax in question clearly bears fiscal relation to the protection, opportunities and benefits given Humble by this State.

Turning to the question of multiple taxation and the Commerce Clause, the prevention of double taxation is, of course, the whole reason for apportioning income. During the years in question, the South Carolina three factor formula allocated 1.0%, 1.1% and 1.2% of Humble's overall income to this State. The record does not disclose what portion of Humble's income was taxed by all states combined. If, in fact, Humble paid income taxes on more than one hundred (100%) percent of its income to all states combined, it has not attempted to prove that fact. See *Covington Fabrics, supra.* Humble has, however, introduced into evidence foreign laws from a number of states which levy extractions known generally as severance taxes. These taxes are not income taxes, they are privilege taxes. For example, the Texas severance tax is described as an "occupation tax on oil produced measured by number of barrels of oil taken". See *State v. Humphrey,* Tex. Civ. App., 159 S. W. (2d) 162 (1942). It has been settled law for many years that it is not multiple taxation to levy taxes on different incidents, for example, a single taxpayer may pay property taxes, privilege taxes and income taxes and not be subject to multiple taxation. Humble has shown no multiple burden.

* * * * * *

Having determined that the additional tax and interest in question was properly assessed, the Complaint is dismissed and this action ended.

And it is so ordered.

Affirmed.