1302

M. LOWENSTEIN CORPORATION and Clark-Schwebel Fiberglass Corporation, Appellants v. SOUTH CAROLINA TAX COMMISSION, Respondent.

(378 S. E. (2d) 272)

Court of Appeals

*John C. von Lehe, Jr., J. Rutledge Young, Jr.,* and *Stephen P. Groves* of *Young, Clement, Rivers & Tisdale,* Charleston, *for appellants.*

*Chief Deputy Atty. Gen. Joe L. Allen, Jr.,* and *Deputy Atty. Gen. Ray N. Stevens,* Columbia, *for respondent.*

Heard Jan. 17, 1989.

Decided March 13, 1989.

*Per Curiam:*

Appellants M. Lowenstein Corporation and Clark-Schwebel Fiberglass Corporation brought this action against respondent South Carolina Tax Commission to recover taxes they had paid under protest.[1] The Circuit Court denied recovery. We affirm.

---

[1] This action was brought pursuant to Section 12-47-220, Code of Laws of South Carolina, 1976. An action brought pursuant to the statute authorizing recovery of taxes paid under protest is an action at law. *See Newberry Mills, Inc. v. Dawkins,* 259 S. C. 7, 190 S. E. (2d) 503 (1972) (action brought pursuant to Section 65-2662, Code of Laws of South Carolina, 1962, predecessor to Section 12-47-220). "In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings." *Hibernian Soc'y v. Thomas,* 282 S. C. 465, 469, 319 S. E. (2d) 339, 342 (Ct. App. 1984).

Lowenstein is in the business of manufacturing textiles. Clark-Schwebel is in the business of manufacturing fiber-glass fabrics. Lowenstein and Clark-Schwebel have their principal places of business in New York, but they also conduct business in South Carolina. Lowenstein is the parent corporation of Clark-Schwebel. There are two types of income in dispute in this matter: interest income and gain from repurchase of bonds. During the tax years 1978 through 1981, Clark-Schwebel generated income in the form of interest on loans it made to Lowenstein. During the 1978 tax year, Lowenstein generated income in the form of gain realized by repurchasing some of its own bonds on the open market at less than face value. Lowenstein and Clark-Schwebel filed combined income tax returns. Each allocated the income in dispute to New York as its principal place of business. The South Carolina Tax Commission assessed, and Lowenstein and Clark-Schwebel paid under protest, additional taxes on the income in dispute.

Two questions are presented on appeal: (1) whether, under the applicable South Carolina statutes, this state may tax Clark-Schwebel on the interest income and Lowenstein on the gain from the repurchase of the bonds; and (2) whether, under the United States and South Carolina Constitutions, this state may tax Clark-Schwebel on the interest income without violating its right to due process.[2]

---

[2] The Circuit Court ruled on only one constitutional issue: Clark-Schwebel's due process rights relating to taxation of its interest income. The Court did not rule upon whether taxing a portion of Lowenstein's gain on its bonds was a due process violation, nor did the Circuit Court rule upon any matters relating to the commerce clause. No motion was made to amend the judgment. *See* Rule 59(e), SCRCP. These matters are not preserved on appeal and cannot be addressed by this Court. *Talley v. South Carolina Higher Educ. Tuition Grants Comm.*, 289 S. C. 483, 347 S. E. (2d) 99 (1986). Furthermore, no exception addresses, and the appellants do not argue, the failure of the Circuit Court to rule upon constitutional issues relating to taxation of Lowenstein's gain on its bonds. "An issue not raised by an exception will not be considered on appeal." *South Carolina Dep't of Social Servs. v. The Father and Mother*, 294 S. C. 518, 524 n. 22, 366 S. E. (2d) 40, 43 n. 22 (Ct. App. 1988). Beyond the mere assertion of a commerce clause violation, the appellants do not assert or argue a violation of that clause for any particular reason or in any particular manner. This exception then is also deemed abandoned. "Exceptions not argued are deemed abandoned." *Id.* at 524 n. 23, 366 S. E. (2d) at 43 n. 23. "[A]n exception [is] deemed effectively abandoned where the argument relating to the exception consist[s] solely of a 'bald conclusion.' " *Williams v. Leventis*, 290 S. C. 386, 390, 350 S. E. (2d) 520, 523 (Ct. App. 1986).

## I

The first question is answered by deciding whether or not the property producing the income in dispute is "connected with the business of the taxpayer." If the property is connected with the business of the taxpayer it is properly apportioned to South Carolina and all other states in which the corporation conducts business, but if the property is not connected with the business of the taxpayer, it must be allocated to New York.[3]

"The language of a tax statute must be given its plain ordinary meaning in the absence of an ambiguity therein." *Beach v. Livingston*, 248 S. C. 135, 139, 149 S. E. (2d) 328, 330 (1966). Our Supreme Court applied just such a plain meaning in construing the phrase "not connected with the trade or business of the taxpayer." *Texaco, Inc. v. Wasson*, 269 S. C. 255, 266, 237 S. E. (2d) 75, 80 (1977). In *Texaco*, the taxpayer found salt and sulfur in Texas and Louisiana while exploring for and acquiring prospective oil lands. Royalties

---

[3] Article 9 of the Income Tax Act of 1926 governs the allocation of income to the state of the taxpayer's principal place of business and the apportionment of income to South Carolina according to the statutory formula. Article 9 is codified as Sections 12-7-1110 through 12-7-1200, Code of Laws of South Carolina, 1976, as amended. With regard to the types of income in dispute in the instant case, the article provides as follows:

The following items of income shall be specifically and directly allocated in accordance with the following provisions before apportionment of the remaining net income and such items shall not be included in any factor of the apportionment formula:

(1) Interest received by the taxpayer from intangible property not connected with the business of the taxpayer ... less all related expenses shall be allocated to the state in which the principal place of business of a corporation taxpayer is located....

. . . .

(5) Gains and losses from sales of intangible personal property not connected with the business of the taxpayer other than intangible personal property held for sale to customers in the regular course of business, less all related expenses, shall be allocated to the state of a corporation taxpayer's principal place of business....

Section 12-7-1120, as amended. Income which is not allocated is apportioned pursuant to Sections 12-7-1140 through 12-7-1170, as amended.

The question arising under Subsections 12-7-1120(1) and 12-7-1120(5) is not whether the income is or is not connected with the business. Rather, the question is whether the intangible property that produced the income is or is not connected with the business. *See Texaco, Inc. v. Wasson*, 269 S. C. 255, 266, 237 S. E. (2d) 75, 80 (1977) ("The clear intent of this statute [Subsection 12-7-1120(4) ] is that rents and royalties are allocated to the state in which the property is located ... only when the property was not used in or connected with the taxpayer's trade or business.").

were derived from the salt and sulfur deposits. The Court found the salt and sulfur properties were "connected with Texaco's business of discovering oil." *Id.* Thus, the Court held that the disputed income was properly apportioned. The Court reached its conclusion as follows:

> The clear intent of this statute is that rents and royalties are allocated to the state in which the property is located (here, Texas and Louisiana) only when the property was not used in or connected with the taxpayer's trade or business. Because the sulfur and salt royalties are derived from properties connected with Texaco's exploration process, we are of the opinion that they are connected with its trade or business and are not allocable to other states. The fact that Texaco has contracted on a royalty basis with third parties to mine the salt and sulfur discovered on prospective oil lands does not render the income derived from this source unconnected with its trade or business. The properties from which the sulfur and salt were mined are unquestionably connected with Texaco's business of discovering oil. This income is properly a part of Texaco's apportionable, unitary income.

*Id. Texaco* sets forth a common sense approach which, when applied to the facts of the instant case, requires us to conclude that the disputed income is properly apportioned. We apply this approach separately to the two types of income in dispute.

### A

### The Interest Income

Clark-Schwebel consistently generated excess cash which it loaned to Lowenstein. The loans were made daily in increments of uniform amounts and were evidenced by demand notes providing for interest at prime rate plus one percent. Each loan was recorded by Clark-Schwebel under the current assets portion of its balance sheet as a note receivable. The notes receivable accounts increased or decreased from month to month, depending upon borrowings and repayments made by Lowenstein.

Clark-Schwebel used both the repaid funds and interest income in its normal business operations.

We conclude that the demand notes are connected to the business of Clark-Schwebel, and thus the income from the notes is properly apportioned. We reach this conclusion for six reasons. First, the funds loaned to Lowenstein, and evidenced by the demand notes, all originated from, and were generated by, the business of Clark-Schwebel. Second, each month, the interest income produced by the notes was deposited in Clark-Schwebel's general bank accounts and was used for normal business operations. Third, the loan repayments made by Lowenstein were also deposited in Clark-Schwebel's general bank accounts and were also used for normal business needs. Fourth, the notes were created on virtually a daily basis in that the comptroller for Clark-Schwebel monitored its cash daily and wired excess funds to Lowenstein in uniform increments thus creating a continuous stream of notes between Clark-Schwebel and Lowenstein. Fifth, Clark-Schwebel demanded payment on the notes when it required cash to meet the needs of its business, such as when it needed funds to meet income tax payments and to stockpile inventory. Sixth, the fact that the notes generating the interest are demand notes indicates Clark-Schwebel sought to have the funds available, and in fact had the funds available, to meet the needs of its business.

All of the above factors establish a broadbased connection between the demand notes and Clark-Schwebel's business. Such evidence is particularly persuasive when contrasted with Clark-Schwebel's lack of evidence that the demand notes are not connected with the business.

Clark-Schwebel argues that the notes should be treated as long-term assets. It further argues that a distinction should be made between operating funds and investment funds and that only that portion of the interest income actually used for operations is connected with its business. We reject both arguments.

The notes, being demand notes, are obviously short-term. All three witnesses for Clark-Schwebel testified the notes were never separated into two separate types of funds, *i.e.*, operating funds were not kept separate from investment

funds. All funds were treated alike. All funds were received by Lowenstein in the same place, and all were evidenced by negotiable demand notes, identical in their terms except for dates and amounts. Whenever cash receipts exceeded cash demand, Clark-Schwebel wired the excess cash to Lowenstein in uniform increments. The loans were designated as current assets and thus formed part of Clark-Schwebel's working capital. For its own business reasons, Clark-Schwebel apparently made a decision to carry large amounts of working capital and treated its working capital as one operating fund. Furthermore, there is no evidence that the interest income itself was segregated, but rather it was deposited in Clark-Schwebel's general business accounts and used for normal business purposes.[4]

## B

### The Gain from Repurchase of Bonds

We next consider whether the income generated by Lowenstein in the form of a gain realized by repurchasing some of its own bonds is properly apportioned. It is important to remember that, under the terms of the applicable statutes, the answer to the question of whether income is allocated or apportioned depends, not upon whether the income in dispute is connected with the business of the taxpayer, but rather upon whether the property producing the income is connected with the business.[5]

We conclude that the bonds which Lowenstein repurchased are connected to its business, and thus the gain from their repurchase is properly apportioned.

---

[4] Lowenstein and Clark-Schwebel argue that our Supreme Court has already decided that interest income on certain other intercompany loans was properly allocated to New York. They cite specifically *M. Lowenstein and Sons, Inc. v. South Carolina Tax Comm'n*, 277 S. C. 561, 290 S. E. (2d) 812 (1982). Although the opinion of the Court contains language to this effect, the question of whether the interest income in that case was business-connected does not appear to have been an issue in the case. Thus, we regard the language in question not to be controlling in the instant case.

[5] *See supra* note 3 (Subsections 12-7-1120(1) and 12-7-1120(5); *Texaco*, 269 S. C. 255, 237 S. E. (2d) 75).

The director of taxes for Lowenstein testified that the bonds were issued "because the company needed the funds to put into their operations." Lowenstein offered no other reason for the bond issue. Thus, the bonds in question were connected with Lowenstein's business.

## II

A state cannot, without violating the right of the taxpayer to due process, "tax value earned outside of its borders." *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U. S. 307, 315, 102 S. Ct. 3103, 3108, 73 L. Ed. (2d) 787 (1982). However, the ability to determine where value is earned is "often an elusive goal, both in theory and in practice." *Container Corp. of America v. Franchise Tax Bd.*, 463 U. S. 159, 164, 103 S. Ct. 2933, 2939, 77 L. Ed. (2d) 545 (1983). The United States Supreme Court has approved the use of an approach termed "unitary business/formula apportionment":

> [U]nitary business/formula apportionment ... rejects geographical or transactional accounting, and instead calculated the local tax base by first defining the scope of the "unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between one taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction.

*Id.* at 165, 103 S. Ct. at 2940.

Under this approach, the first thing which must be addressed is the meaning of the term "unitary business." (In some cases, the second thing which must be considered is the mechanics of the apportionment formula, but there is no dispute, in the instant case, about that aspect of the approach.)

Lowenstein and Clark-Schwebel argue that there is a denial of the right to due process unless Clark-Schwebel and Lowenstein were operating a single "unitary business."

The Tax Commission, on the other hand, argues that this is not the test. It argues that there is no denial of the right to due process because Clark-Schwebel's business of man-

ufacturing fiberglass fabrics and the interest income it received were both part of a "unitary business."

## A

### The View of the Tax Commission

The test argued by the Tax Commission is the correct test. In cases involving facts comparable to those of the instant case, courts have applied this test in deciding whether certain investment income activities were part of a "unitary business." We find these decisions persuasive. *E.g., Lone Star Steel Co. v. Dolan,* 688 P. (2d) 916, 922 (Colo. 1983) (holding "[t]he interest derived from the short-term notes [evidencing loans from the taxpayer to its parent] is an integral part of Lone Star's business. The surplus funds are produced by that business, the investments are short-term, liquid, made with the intent that both the principal and interest are to be used 'in the regular course of the taxpayer's trade or business. . . .' "); *Silent Hoist & Crane v. Director, Div. of Taxation,* 100 N. J. 1, 494 A. (2d) 775 (1985) (holding that the real estate investment activities of the taxpayer were part of its unitary business where the evidence established that the investment operation was merely incidental to the company's manufacturing business); *Comptroller of the Treasury, Income Tax Div. v. NCR Corp.,* 71 Md. App. 116, 137, 524 A. (2d) 93, 103 (1987) *aff'd in pertinent part* 313 Md. 118, 544 A. (2d) 764 (1988) (holding that the taxpayer could not exclude, from its business income, interest income derived from investments of surplus funds in short-term certificates of deposit, commercial papers, government notes and municipal bonds because the interest income was found to have "derived from investment activity within the corporate unity" and the "activity was not a discrete business enterprise, but part of NCR's unitary business." Responding to NCR's argument that the interest payors were not part of NCR's unitary business, the Court stated: "The relationship between the interest payor and NCR, or lack thereof, . . . is not dispositive on the issue of whether a corporate unity exists.").

Where a single corporation derived income from several activities, our Supreme Court has devised a test for determining whether the business is "unitary."

[T]he proper answer to the question of whether or not a business is unitary in nature is given in terms of [1] whether or not the business possesses the characteristics of unity of ownership, unity of management, and unity of operation and [2] whether or not the activities of the business in question contribute to or depend on the other activities of the business.

*Exxon Corp. v. South Carolina Tax Comm'n*, 273 S. C. 594, 600, 258 S. E. (2d) 93, 96 (1979). Each aspect of this test is satisfied by Clark-Schwebel's activities in South Carolina. Thus, the interest income is part of Clark-Schwebel's "unitary business."

The first part of the test is whether the business has the characteristics of unity of ownership, management and operation. This part of the test is clearly satisfied. There is obviously unity of ownership since the fiberglass fabrics activities and the interest-earning activities are both carried on by the same corporation. Unity of management is present since the comptroller for Clark-Schwebel handled both the interest income and the funds used in the day-to-day manufacture of fiberglass fabrics. Moreover, he was subject to the same management and Board of Directors whether his activities involved generating interest income or generating income from manufacturing fiberglass fabrics. No separate management existed for either activity, but rather the same management carried out all activities of the business as a unit. Unity of operation is evidenced by the fact that the interest income activity was operated from the same facilities as was the fiberglass production. The comptroller was physically located in Anderson, South Carolina, where fiberglass fabrics were produced. Unity of operation is further evidenced by the fact that the fiberglass fabrics activity provided the funds from which the interest income was produced.

The second part of the test is whether the interest-earning activities contribute to or depend on the other activities of the business. This part of the test is also satisfied. As we have already said, the interest income was received and deposited in Clark-Schwebel's general business bank accounts. Such income, along with loan repayments from Lowenstein, was used by Clark-Schwebel in its fiberglass

fabrics business to pay income taxes and to stockpile inventory. Furthermore, the income and loan repayments were always available to meet any business needs. The source of the funds for the interest income activity came from the daily operations of the fiberglass fabrics activity. The comptroller made a determination on a daily basis as to whether the fiberglass fabrics had generated cash receipts greater than cash demand. If cash receipts exceeded cash demand, he would loan the excess to Lowenstein. If cash demand exceeded cash receipts, he would receive payments on some of the notes.

## B

### The View of Lowenstein and Clark-Schwebel

We further conclude that, even under the test argued by Lowenstein and Clark-Schwebel, the right to due process has not been denied because they were, in fact, operating a single "unitary business."

In a case where the United States Supreme Court decided that a corporation and its foreign subsidiaries constituted a single unitary business, the Court based its decision on evidence of significant mutual interdependence and flow of value between them. *Container Corp. of America v. Franchise Tax Bd.*, 463 U. S. 159, 103 S. Ct. 2933, 77 L. Ed. (2d) 545 (1983).[6]

One element identifying a unitary relationship is the flow of capital between the two corporations. *Id.* As we have said, Clark-Schwebel wired all of its excess funds on a daily basis to Lowenstein which then used the funds in its business. Funds were loaned to Lowenstein even when Clark-Schwebel had been told by Lowenstein that it would be unable to repay the loans if demanded. Clark-Schwebel likewise received a flow of capital from Lowenstein. As we have also

---

[6] Unlike the instant case, *Container* involved the issue of whether the taxing state could properly apportion income, not of the taxpayer corporation, but of its foreign subsidiaries. Other cases where the Court has applied the test argued by Lowenstein and Clark-Schwebel have involved issues similar to the issue in *Container*. *E.g., ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U. S. 307, 102 S. Ct. 3103, 73 L. Ed. (2d) 787 (1982); *F. W. Woolworth Co. v. Taxation and Revenue Dep't of New Mexico*, 458 U. S. 354, 102 S. Ct. 3128, 73 L. Ed. (2d) 819 (1982).

said, it received repayments whenever its cash demands exceeded its cash receipts. This occurred when income tax payments were due or it was necessary to stockpile inventory. Additionally, Lowenstein guaranteed a long-term debt incurred by Clark-Schwebel in constructing a fiberglass plant.[7]

The result of this arrangement was a central pool of money which each corporation drew upon as its business needs dictated. Lowenstein and Clark-Schwebel each depended upon the pool to carry on business and this created a unitary business arrangement.

A second element identifying a unitary relationship is the corporations' holding themselves out to the public as being integrated. (The expert witness for Lowenstein and Clark-Schwebel testified that this was evidence of a unitary relationship.)

The annual reports issued by Lowenstein to its stockholders and the public repeatedly identify Clark-Schwebel and Lowenstein as part of an integrated business. The annual reports identify the "Company" as a single business "conducted by divisions within three industry segments." According to the report, the segments of the "Company" consist of the apparel fabrics segment, textile home products segment and textile industrial products segment. The last segment is predominantly fiberglass products produced by Clark-Schwebel. This same identification of the "Company" is repeated in other Annual Reports and shows Lowenstein and Clark-Schwebel held themselves out as being in a single business with different segments producing a flow of value to the whole enterprise. The 1980 Annual Report identifies the industrial fabrics segment as being a principal reason the "Company" was profitable in that year.

A third element identifying a unitary relationship is the extent of management services provided by one corporation to the other. *Id.* Lowenstein provided a telephone communication system for Clark-Schwebel. Lowenstein's tax de-

---

[7] The guaranteeing of one corporation's loans by the other·corporation was also cited by the United States Supreme Court as evidence of a unitary relationship. *Container Corp. of America v. Franchise Tax Bd.*, 463 U. S. 159, 103 S. Ct. 2933, 77 L. Ed. (2d) 545 (1983).

partment prepared the combined tax returns for the corporations. Lowenstein exercised and reviewed some internal audit controls for Clark-Schwebel. Legal services to enforce collection on Clark-Schwebel's accounts receivable were provided by Lowenstein. Lowenstein received and reviewed on a monthly basis Clark-Schwebel's financial statements. Both corporations were under a common pension plan, and Lowenstein provided some warehouse space to Clark-Schwebel on a periodic basis.

A fourth element identifying a unitary relationship is the extent of control held by one corporation over the other. *Id.* Lowenstein exercised virtually total control over Clark-Schwebel. Lowenstein owned ninety-three percent of Clark-Schwebel's stock. The Boards of Directors of Lowenstein and Clark-Schwebel were interlocking and the same individual was Chairman of the Board of both corporations.

In addition, Lowenstein exercised control over Clark-Schwebel by virtue of an agreement between the two corporations. Under the agreement, the Board of Clark-Schwebel consisted of nine members, with six members being selected by Lowenstein. All resolutions required an affirmative vote of five directors. Certain actions were prohibited unless ninety-six percent of the common stockholders approved the actions. The actions were issuing additional common stock, the sale of substantially all of Clark-Schwebel's property, the merger of Clark-Schwebel, the dissolution of Clark-Schwebel and the mortgaging of any of Clark-Schwebel's property for more than $100,000. Thus, it is clear Clark-Schwebel was by no means independent from Lowenstein.

The power of Lowenstein to control Clark-Schwebel was more than theoretical. It is clear that Clark-Schwebel made loans to Lowenstein because Lowenstein required Clark-Schwebel to make the loans. As we have said, the loans continued even during a period when Lowenstein acknowledged that it could not repay the loans if demanded. Lowenstein so dominated Clark-Schwebel that the President of Clark-Schwebel could not demand payment of the notes during this period. Instead of obtaining any protection for Clark-Schwebel against nonpayment of the loans, the best the President could do was to obtain an agreement from Lowenstein that the value of his personal interest as a

stockholder would not be affected by the loans becoming uncollectible.

Thus, even under the view of Lowenstein and Clark-Schwebel that due process requires a finding that they conduct a single unitary business, there is no due process violation in the instant case.

For these reasons, the order of the Circuit Court is

Affirmed.

