ATLANTIC RICHFIELD COMPANY; Arco Pipe Line Company; BP Alaska, Inc.; Exxon Corporation; Exxon Pipeline Company; and Sohio Pipe Line Company, Appellants,

v.

STATE of Alaska; Alaska Department of Revenue; Alaska Department of Administration; Commissioner of Revenue Robert D. Heath, and Commissioner of Administration Lisa Rudd, Appellees.

No. S–52.

Supreme Court of Alaska.

Aug. 16, 1985.

J.W. Bullion, Ralph I. Miller, Thompson & Knight, Mark L. Hazelwood, Robert E. McManus, Atlantic Richfield Co., Dallas, Tex., and William B. Rozell, John F. Clough, III, Faulkner, Banfield, Doogan & Holmes, Juneau, for appellants Atlantic Richfield Co. and ARCO Pipe Line Co.

John F. Daum, Barton H. Thompson, Jr., M. Randall Oppenheimer, O'Melveny & Myers, Los Angeles, Cal., Barry L. Wertz, Archie Parnell, Exxon Co., U.S.A., Houston, Tex., and Robert J. Mahoney, Hartig, Rhodes, Norman, Mahoney & Edwards, Anchorage, for appellants Exxon Corp. and Exxon Pipeline Co.

David A. Nelson, Terrence G. Perris, James J. Maiwurm, Howard J.C. Nicols, Squire, Sanders & Dempsey, Cleveland, Ohio, William H. Lutz, Jr., Squire, Sanders & Dempsey, Miami, Fla., Richard H. Hahn, Standard Oil Co., Cleveland, Ohio, and Richard O. Gantz, Carl J.D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellants Sohio Alaska Petroleum Co., Sohio Pipe Line Co., and BP Alaska, Inc.

Mitchell Rogovin, George T. Frampton, Jr., Michael D. Lowe, Jeffrey Blattner, Rogovin, Huge & Lenzner, Washington, D.C., Jonathan K. Tillinghast, Birch, Horton, Bittner, Monroe & Pestinger, Juneau, John R. Messenger, Preston, Thorgrimson, Ellis & Holman, Deborah Vogt, Kathryn Kolkhorst, Asst. Attys. Gen., Juneau, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellees.

J. Lawrence Blankenship and Donna E. Cox, Oklahoma City, Okl., for amicus curiae State of Okl., ex rel. Oklahoma Tax Comn.

Robert H. Carpenter, Jr., Asst. Atty. Gen., William J. Guste, Jr., Atty. Gen. of La., Baton Rouge, La., for amicus curiae State of La.

Bobby R. Long, Jackson, Miss., for amicus curiae Mississippi State Tax Comn.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and MOORE, JJ.

## OPINION

BURKE, Chief Justice.

This is an appeal brought by several major oil producing companies in Alaska [1] challenging the constitutionality of the Oil and Gas Corporate Income Tax, Former AS 43.21 (repealed 1982) ("the Oil Tax").[2] The issue is whether the State of Alaska must, as a matter of constitutional law, use the formula apportionment method to determine the portion of each corporation's worldwide oil production and pipeline transportation income that can be attributed to Alaska. During the tax years 1978 to 1981 the state used separate accounting, instead of formula apportionment, to determine taxable production and pipeline transportation income.

Various actions challenging the constitutionality of the Oil Tax were consolidated on August 27, 1980, in the superior court.[3] Appellants ARCO, Exxon, and Sohio argued below that the Oil Tax violated the commerce, due process, contract, and equal protection clauses of the United States

Constitution, as well as the equal protection clause of the Alaska Constitution and the state constitutional and statutory provisions against retroactivity. They sought a refund of taxes paid under the Oil Tax.

On November 12, 1981, the state moved for summary judgment seeking a declaration that the Oil and Gas Corporate Income Tax Act is constitutional. The trial court rejected the oil companies' claims of unconstitutionality and granted the state's motion for summary judgment. We affirm.

## I. THE OIL TAX

In 1959, Alaska adopted the three-factor apportionment formula of the Uniform Division of Income for Tax Purposes Act (UDITPA) to determine the share of income of an integrated (unitary) interstate business subject to Alaska income taxation. AS 43.20.130 (repealed 1975).[4] The apportionment formula relies on three indicators of business activity—payroll, property and sales—to compute Alaska's share of taxable income. *Id.* The value of property, payroll and sales in Alaska is compared to the value of property, payroll and sales of the corporation worldwide. The resulting ratio is then multiplied by the corporation's apportionable net income worldwide to arrive at an approximation of Alaska's share of taxable income.

Prior to the enactment of the Oil Tax in 1978, all of the income tax liability of oil companies was determined under the formula apportionment method. Under the Oil Tax, a different methodology, separate

1. Atlantic Richfield Company and ARCO Pipeline Company (collectively "ARCO"), Exxon Corporation and Exxon Pipeline Company (collectively "Exxon"), and BP Alaska, Inc. and Sohio Pipe Line Company (collectively "Sohio").

2. AS 43.21 (Ch. 110, § 3, SLA 1978; am. ch. 113, §§ 28–32, SLA 1980; am. ch. 116, §§ 6–11, § 17 SLA 1981) was repealed effective January 1, 1982. Ch. 116, § 19, SLA 1981. For convenience, we refer to the Oil Tax by the former statutory section numbers throughout this opinion. *See* Appendix 1 for the full text of AS 43.21.

3. Other oil companies were also involved initially in the litigation, but were dismissed upon agreeing to defer their constitutional claims pending resolution of this case.

4. In 1970, Alaska adopted the Multistate Tax Compact, enacted as AS 43.19.010. It is basically a restatement of UDITPA with a few minor changes. The three-factor apportionment formula is now described at AS 43.19.010, art. IV, §§ 9–15.

accounting,[5] was implemented to calculate the production and pipeline transportation income subject to Alaska taxation. The goal of the separate accounting method was to determine that portion of the value of a barrel of oil attributable to the oil being produced, i.e., taken from the ground. AS 43.21.020.

The separate accounting of oil production income began with the determination of gross production revenue or "gross income." [6] The Oil Tax defined gross income as the value of the oil at the point of production, i.e., the well-head price. AS 43.21.020(b). Essentially, gross income equalled the price at which the oil was sold, or could be sold, to a refinery less transpor-

tation expenses. AS 43.21.020(b). The price at which oil was sold, or could be sold, to a refinery obviously did not include refining and marketing costs and profits. These costs and profits were thus excluded in determining the gross income figure for Alaskan oil. In addition, a number of other costs were deducted from gross income. "Upstream" costs, such as exploration expenses, royalties, lease acquisition and development costs, and general overhead and administrative expenses, and "downstream" costs, such as transportation and marketing costs were deducted from gross income. AS 43.21.020(c). The end result was net production income, which was

5. The oil companies dispute whether the methodology of the Oil Tax is in fact "true" separate accounting. *See infra* section II.B.

6. The following graph, submitted by the State of Alaska, illustrates the estimated revenues, costs and profits contained in each barrel of Alaskan oil during the years 1978–80:

SOURCE. Deakin 2d Supplemental Affidavit ¶ 15, R 16917, 16929

CHART 1

taxed at the 9.4% rate applicable to all other corporate income at that time. Former AS 43.20.011 (amended, repealed and reenacted 1981).

The Oil Tax used a similar methodology to tax income from the pipeline transportation of oil and gas in Alaska. The items of income and expense related to Alaska pipeline transportation were keyed to the amount reported by the oil companies to the Federal Energy Regulatory Commission as net operating income. AS 43.21.030. The validity of this portion of the Oil Tax is also at issue in this case, though the parties focus primarily on the taxation of production income.

Under AS 43.21.040, all other income of the oil companies continued to be taxed under the UDITPA formula apportionment method. Such other income was primarily from marketing and refining operations. In computing this income, worldwide oil production and pipeline transportation income was subtracted from the total amount of income subject to apportionment by Alaska. Then the three-factor formula was applied, again with the production and pipeline income in Alaska deleted. The result attributed to Alaska a portion of worldwide refining and marketing income of the oil company approximating the share of such activities occurring in Alaska. This income, like the production and pipeline income, was taxed at the rate of 9.4%. Former AS 43.20.011 (amended, repealed and reenacted 1981).

The Oil Tax was repealed effective January 1, 1982. Ch. 116, § 19, SLA 1981. It was replaced with a modified apportionment formula for the ensuing tax years. AS 43.20.072. The legislature took this step primarily to avoid a further increase in the possible $1.8 billion liability caused by this litigation.

## II. THE OIL TAX IS "TRUE" SEPARATE ACCOUNTING

There are three basic methods by which the income of a multistate enterprise can be divided among the states entitled to tax the enterprise's income: separate accounting, specific allocation by situs and formula apportionment. The state claims the Oil Tax is true separate accounting, while the oil companies contend it is specific allocation by situs.

### A. The Three Methods For Division Of Income

#### 1. Separate Accounting

Separate accounting attempts to carve out of the taxpayer's overall business the income derived from sources within a single state, and by accounting analysis, to determine the profits attributable to that portion of the business.[7] Income within the state is determined without reference to the success or failure of the taxpayer's activities in other states.[8] In the case of goods (such as crude oil) sent to another state for processing, separate accounting values these goods at the price which could be obtained for them in their unprocessed form when leaving their state of origin.[9] In other words, separate accounting recognizes that crude oil has a marketable value before it is refined.

#### 2. Specific Allocation by Situs

Specific allocation by situs refers to the method of dividing a tax measure (in whole or in part) by tracing particular property, receipts, or income to their source state, and attributing the item *in its entirety* to that state.[10] This method is troublesome because more than one state is likely to have a legitimate basis for taxing the same item, especially when the tax is one measured by income.[11] The specific allocation

---

7. *See generally* J. Hellerstein, State Taxation: Corporate Income and Franchise Taxes ¶ 8.3, at 323–327 (1983).

8. P. Hartman, Federal Limitations on State and Local Taxation § 9.17, at 522 (1981).

9. G. Altman & F. Keesling, Allocation of Income in State Taxation 38 (2d ed. 1950).

10. J. Hellerstein, *supra* note 7, ¶ 8.4, at 328.

11. *Id.*

method has been used commonly with "non-business" income such as income from dividends, patent and copyright royalties, and gains or losses from the sale of capital assets.[12] Under UDITPA, some non-business income of this nature is allocated in its entirety to the situs state. *See* AS 43.19.010, art. IV, §§ 5–8.

Confusion may arise because the separate accounting methodology is very similar to the specific allocation approach. Both methods attempt to trace income to an identifiable source. The primary difference in the two methods is that separate accounting looks to the activities in the state and seeks to determine the income related to that activity. Specific allocation attributes income according to situs, or some other specific characteristic of the business enterprise, rather than on the basis of where the income itself was earned. Moreover, specific allocation results in *all* of a specified type of income and *all* associated profits being allocated to one state. Separate accounting, on the other hand, attempts to segregate out *only* those profits attributable to activities within the state for taxation by that state.

### 3. *Formula Apportionment*

Formula apportionment is the method commonly used to divide the income of a unitary business [13] among various jurisdictions in which the business operates. The formula method, "unlike separate accounting, does not purport to identify the precise geographical source of a corporation's profits; rather, it is employed as a rough approximation of a corporation's income that is reasonably related to the activities conducted within the taxing State."[14] The formula method assumes that the total income of a business enterprise results from certain income producing factors—typically property, payroll and sales. The value of the corporation's property, payroll and sales within the taxing state is compared with the value of these factors outside the taxing state. The resulting ratio is then multiplied by the total apportionable net income worldwide of the multi-state corporation.[15]

### B. *The Oil Tax Is Separate Accounting*

The oil companies equate the Oil Tax with the specific allocation by situs method. They contend that the Oil Tax attributes *all* of the income and profits from oil production and transportation to Alaska. Their argument ignores the difference between the Oil Tax and the specific allocation method. The Oil Tax does not attribute income from the production of oil *in its entirety* to Alaska, the source state. Instead, it attempts to tax only that portion of income from the oil which is fairly related to Alaskan production activities. While total revenue for a barrel of oil during 1978–80 was approximately $26.64, only $6.77 was deemed production income attributable to Alaskan activities and subject to the Oil Tax.[16] In segregating from total income a portion related only to activities in the state, the Oil Tax operates as a separate accounting system.

The companies argue that the Oil Tax is not true separate accounting because it fails to take into account the profit-producing nature of activities occurring outside

---

12. *Id.* at 329.

13. "[A] unitary business may be defined simply as any business which is carried on partly within and partly [outside] the taxing jurisdiction." Keesling & Warren, *The Unitary Concept In the Allocation of Income,* 12 Hastings L.J. 42, 46 (1960).

14. *Moorman Mfg. v. Bair,* 437 U.S. 267, 273, 98 S.Ct. 2340, 2344, 57 L.Ed.2d 197, 204 (1978).

15. P. Hartman, *supra* note 8, § 9.18, at 523–524.

16. The wellhead price did not include refining and marketing costs and profits. The following deductions were also taken from the wellhead price: royalties, native corporation revenue sharing, production, *ad valorem* and windfall profit taxes, direct operating expenses, exploration, acquisition, and development costs, uncapitalized interest and general overhead and administrative expenses inside and outside Alaska (including a reasonable profit). AS 43.21.020(c); 15 AAC 21.200 (Eff. 2/22/79). *See* graph *supra* note 6.

Alaska. For example, the geological and geophysical analysis of the Prudhoe Bay area was conducted primarily outside Alaska. The companies argue that only the expenses associated with these outside activities are deductible in computing income subject to the Oil Tax. Thus, in their view, the Oil Tax taxes profits earned outside Alaska.

The state contends that oil companies can deduct profits attributable to general overhead or administrative activities outside of Alaska. Under Department of Revenue regulations, profits associated with such activities could be deducted if the taxpayer in fact considered them profit generally and reported them as such to the stockholders. 15 AAC 21.290(b) (Eff. 2/22/79, am. 3/26/82). The oil companies claim that the Security Exchange Commission prohibits the allocation of profits in this manner, citing 15 U.S.C. § 78m(b)(2)(B)(ii) (1982). This section provides that every issuer of a security subject to the provision must have an internal accounting system that permits preparation of financial statements "in conformity with generally accepted accounting principles or any other criteria applicable to such statements." The parties' experts disagree on the acceptability, under general accounting principles, of allocating profits to general overhead and administrative activities. Even if we assume that the allocation of profits to these activities is not generally accepted, 15 U.S.C. § 78m(b)(2)(B)(ii) allows the use of "other criteria" in financial statements. If, as the oil companies claim, profits exist that are actually attributable to general overhead and administrative activities outside of Alaska, the Securities Exchange Act does not prevent them from reporting such profits to their shareholders, and then deducting them from their Alaska income tax.

Although amended after the repeal of the Oil Tax in 1982, 15 AAC 21.290(b) (Eff. 2/22/79, am. 3/26/82) operates retroactively.[17] The oil companies, therefore, may amend their tax reports and returns to deduct any outside-generated profits attributable to general overhead and administrative activities associated with Alaskan oil production not previously deducted in computing Alaskan taxable income.

The companies also assert that the Oil Tax is an inappropriate methodology because it presumes that crude oil has a value, i.e., that income has been generated when the oil is merely brought out of the ground. The oil companies argue that oil has no value whatsoever until it is sold.

The oil companies cite our decision in *Sjong v. State, Department of Revenue*, 622 P.2d 967 (Alaska 1981), *appeal dismissed*, 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284 (1982), for the proposition that the oil has no value until it is sold. We find their reliance misplaced. In *Sjong*, we upheld an apportioned net income tax as-

---

17. The only logical interpretation of the 1982 amendment to 15 AAC 21.290(b) is that it operates retroactively for the tax years 1978–81. It cannot be meaningfully applied prospectively because it was adopted *after* the Oil Tax was no longer in effect. We must assume that the process of amending 15 AAC 21.290(b) was intended to be operative. We cannot imagine that the Department of Revenue ("Department") would engage in a futile act. *See* 2A C. Sands, Sutherland Statutory Construction § 45.12, at 54 (4th ed. 1984).

The retroactivity of the Department's regulations is governed by the Alaska Administrative Procedure Act, AS 44.62.240. Under this statute, an "interpretative regulation," such as 15 AAC 21.290(b), may be retroactive only if the agency "has adopted no earlier inconsistent regulation and has followed no earlier course of conduct inconsistent with the regulation." The Department's earlier omission of a deduction for outside-generated profits attributable to general overhead and administration associated with Alaskan oil production could be construed as inconsistent conduct with the 1982 amendment to 15 AAC 21.290(b). AS 44.62.240, however, is concerned with the issues of fairness and notice. *See, e.g.*, AS 43.21.050(d) (authorizing Department to fashion an equitable tax if relief from an unfair allocation is required). In this case, a retroactive interpretation of the 1982 amendment confers a benefit on the oil companies by allowing an additional tax deduction not previously available. Unlike many retroactive enactments, 15 AAC 21.290(b), as amended, does not create a harsh or unfair result for the affected parties. Therefore, the 1982 amendment to 15 AAC 21.290(b) operates retroactively for the tax years 1978–81.

sessed against a nonresident crab fisherman, who fished exclusively in the international waters surrounding Alaska and sold his catch only to Alaska processors and canneries. Sjong claimed that no taxable income could be attributed to the state because he caught the crabs in international waters. We responded that "the process of fishing results in no profits until the catch is sold to processors in Alaska." 622 P.2d at 972 (footnote omitted). Obviously, profits do not result from crab fishing or oil production until the product is sold. This does not negate the fact that profits generated by the sale are partly attributable to the inherent value of the crab or oil at its point of production.

In the state's view, the extraction of a natural resource, in and of itself, generates income. Thus, it argues that it is reasonable to attribute the income identified with the extraction of oil, measured in terms of "well-head value," to the state in which the oil was extracted. The state is joined in this position by Amicus Curiae, the states of Louisiana, Mississippi and Oklahoma, all which have long employed separate accounting to tax oil production income.[18]

The United States Supreme Court has likewise recognized the inherent value generated by the extraction of natural resources. In upholding the constitutionality of Montana's severance tax on coal mined in the state, the Court reasoned that "[t]he entire value of the coal, before transportation, originates in … [Montana], and mining of the coal depletes the resource base and wealth of the State, thereby diminishing a future source of taxes and economic activity." *Commonwealth Edison v. Montana*, 453 U.S. 609, 624, 101 S.Ct. 2946, 2957, 69 L.Ed.2d 884, 898 (1981) (footnote omitted). Before it is transported for sale, oil, like coal, has inherent value, to which profits and income can properly be attributed.[19]

We hold that the Oil Tax is fundamentally a separate accounting method for dividing income, distinct from both the specific allocation by situs and formula apportionment methods.

C. *Separate Accounting More Accurately Attributes Income Generated from Alaskan Oil Than Does Formula Apportionment*

The use of separate accounting to apportion the income of a unitary business, such as each of the companies in this litigation, has been roundly criticized.[20] The United States Supreme Court has noted:

The problem with this method is that formal accounting is subject to manipulation and imprecision, and often ignores or captures inadequately the many subtle and largely unquantifiable transfers of

---

18. *See also Texas Co. v. Cooper*, 236 La. 380, 107 So.2d 676, 687–91 (1958) (rejected argument that production of oil in absence of sale, does not result in taxable income); *Magnolia Petroleum v. Oklahoma Tax Comm'n*, 190 Okl. 172, 121 P.2d 1008, 1013 (1941) ("[O]il produced in the state had an easily ascertainable market price that would represent the value of the product attributable wholly to Oklahoma.").

19. While party to a tax suit in South Carolina, Exxon recognized the existence of oil's wellhead value. In its brief, Exxon asserted that "E & P [exploration and production] income is fully earned at the wellhead, and … [is] functionally independent of … refining and marketing operations." Appellant's Opening Brief at 19, *Exxon v. South Carolina Tax Comm'n*, 273 S.C. 594, 258 S.E.2d 93 (1979), *appeal dismissed*, 447 U.S. 917, 100 S.Ct. 3005, 65 L.Ed.2d 1109 (1980). Exxon went on to note that their witness testified that the posted field price was also accepted by the accounting profession as a reliable, independent measure of the value of crude oil at the wellhead. Using this value, … the net income earned by exploration and production could be and is accurately measured. This is in accordance with generally accepted accounting principles, because crude oil has a known, realizable value. *Id.* at 26.

20. *See, e.g.*, G. Altman & F. Keesling, *supra* note 9, at 38 ("It is obvious, however, that a separate accounting, no matter how detailed, is basically false if the business done in more than one state is of a unitary character, …"); Dexter, *The Unitary Concept in State Income Taxation of Multistate—Multinational Businesses*, 10 Urb. Lawyer 181, 207 (1978) ("[T]he use of separate accounting to attribute unitary income to a taxing jurisdiction is conceptually inconsistent.").

value that take place among the components of a single enterprise.

*Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 164–65, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545, 553 (1983) (citation omitted). For instance,

> while it [separate accounting] purports to isolate portions of income received in various States, [it] may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale. Because these factors of profitability arise from the operation of the business as a whole, it becomes misleading to characterize the income of the business as having a single identifiable "source." Although separate geographical accounting may be useful for internal auditing, *for purposes of state taxation it is not constitutionally required.*

*Mobil Oil v. Commissioner of Taxes*, 445 U.S. 425, 438, 100 S.Ct. 1223, 1232, 63 L.Ed.2d 510, 521 (1980) (emphasis added; citations omitted).

These criticisms, however, are inapplicable to the oil and gas industry. The standard three-factor formula apportionment method was "developed and designed to meet the needs of manufacturing and mercantile industries, and [is] poorly adapted to a good many other businesses."[21] The United States Supreme Court has noted that the three-factor formula is "necessarily imperfect":

> First, the one-third-each weight given to the three factors is essentially arbitrary. Second, *payroll, property, and sales still do not exhaust the entire set of factors arguably relevant to the production of income.*

*Container Corp. of America v. Franchise Tax Board*, 463 U.S. at 183 n. 20, 103 S.Ct. at 2949 n. 20, 77 L.Ed.2d at 565 n. 20

(emphasis added). An assumption made in the use of formula apportionment is that *"major* income-producing elements can be identified and that these major elements contribute the largest portion of the unitary income of the taxpayer."[22]

A unique characteristic of unitary oil and gas businesses is that the major income-producing element is the value of the oil and gas reserves in the ground. While this element can be readily identified, it is not recognized under traditional formula apportionment methods.[23] Instead, the typical factors used are property, payroll and sales, none of which accurately reflects the oil and gas corporations' activities in Alaska. The property factor includes only the original cost of the wells and the lease, which do not necessarily represent the value of the oil reserves themselves. *See* AS 43.19.010, art. IV, § 11. As a result, the Prudhoe Bay field is valued at about one percent of its actual worth.[24] Under UDITPA, the payroll factor includes only wages paid to employees based in the state. AS 43.19.010, art. IV, §§ 13–14. Oil production, however, is not a labor-intensive industry. Moreover, much of the production work is done by employees based in other states, or by independent contractors, whose earnings do not appear in the payroll factor. Finally, and most importantly, the sales receipts under UDITPA are credited solely to the destination state. AS 43.19.010, art. IV, § 16. The oil companies and the state agree that only a "tiny fraction" of the oil produced in Alaska is actually sold within the state.

For all of the above reasons, separate accounting, not formula apportionment, is the prevailing method throughout the United States for reporting income from oil production.[25] The Comptroller General's

**21.** J. Hellerstein, *supra* note 7, ¶ 10.9, at 689.

**22.** A. Cohen, Apportionment and Allocation Formulae and Factors Used by States in Levying Taxes Based on or Measured by Net income of Manufacturing, Distributive and Extractive Corporations 14 (1954). [Record 1561]

**23.** *Id.*

**24.** *See* B. Sorensen, Memorandum to the Honorable Nels A. Anderson, Jr. (May 27, 1976) (discussing state corporate income tax).

**25.** Rudolph, *State Taxation of Interstate Business: The Unitary Business Concept and Affiliated Groups,* 25 Tax L.Rev. 171, 191 (1970). Of the top five producing states, three—Alaska, Louisiana and Oklahoma—require the use of

report explains that states use separate accounting to determine the income division for unitary oil and gas businesses "because it conforms more to [the businesses'] financial accounting procedures, and ... more accurately reflects income than formula apportionment." [26]

Alaska has not employed separate accounting to divide the income of all unitary businesses. According to the state, the Alaska legislature turned to separate accounting for oil producing businesses only after it determined that the use of formula apportionment to compute Alaska's share of oil production income would seriously underestimate the production income that was rightly subject to taxation by this state.[27]

The oil companies cite portions of legislative history to show that the Oil Tax was imposed in an effort to unilaterally effect a renegotiation of oil leases so as to shift the cost of Alaska's government to the oil industry. The legislature, however, formally declared that the income tax of corporations engaged in oil production or pipeline transportation would be computed under the Oil Tax because the formula apportionment method did not fairly represent the extent of those corporations' oil production and transportation activities in Alaska. Ch. 110, § 1, SLA 1978. To look beyond

this articulated basis would lead to a "parade of legislators' affidavits containing their perceptions" of the Oil Tax's purpose. *Alaska Public Employees Association v. State*, 525 P.2d 12, 16 (Alaska 1984). We have recently disapproved of such inquiries. *Id.* The United States Supreme Court has also declined to search for the "real" motive beyond the legislature's expressed purposes when adjudicating equal protection and commerce clause challenges. In *Minnesota v. Clover Leaf Creamery*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) the Court stated that it would

> assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they "could not have been a goal of the legislation."

449 U.S. at 463 n. 7, 101 S.Ct. at 723 n. 7, 66 L.Ed.2d at 668 n. 7 (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514, 525 n. 16 (1975)). Nothing in the record leads us to conclude that accurate and fair allocation could not have been the legislature's goal in enacting the Oil Tax.[28]

■ The fact that the traditional formula apportionment method inaccurately reflects the oil companies' income and profits derived from Alaskan production activities is

---

separate accounting to determine income attributable to oil production. Texas imposes no corporate income tax, and California requires formula apportionment. Statistical Abstract of the United States at 730 (1983). *But see* Cal.Rev. & Tax Code Ann. § 25137 (West 1979) (allowing separate accounting, or other alternative methods of apportionment, when total formula apportionment does "not fairly represent the extent of the taxpayer's business activity in this state.").

26. GAO Report to the Chairman, House Committee on Ways and Means: Key Issues Affecting State Taxation of Multijurisdictional Corporate Income Need Resolving 3 (1982). [Record 17,023].

27. The Oil Tax was enacted only after it was considered by two legislatures over a four year period. Sixty-three hearings were held and dozens of studies and reports were made.

28. *See, e.g.,* Minutes of Senate Finance Committee (May 21, 1977): "[T]he income tax is not

designed to pick up additional money but to try to establish equal treatment between companies operating within the state." (Statement of Senator Chancy Croft) [Record 4759]; Minutes of Senate Resource Committee (February 22, 1978): "If we're seeking to raise money—I think the most effective way is through a severance tax." (Statement of Commissioner Sterling Gallagher [Record 1704] ); Office Memo to Senator Rader from Kay Brown (December 22, 1977): "[S]eparate accounting [is the] most equitable method because under it every corp[oration] pays [the] same effective tax rate." (Statement of Senator Chancy Croft) [Record 1661]; Testimony Before House/Senate Resources Committees (January 25, 1978): "[T]he purpose [of separate accounting] is not to get higher taxation, but it gives you a direct fix on what the profitability of the industry's operations are." (Statement of consultant Milton Lipton) [Record 1941]

illustrated in the case of Sohio. The oil companies maintain that during 1978–80, when the Oil Tax was in effect, an average of only 10% of Sohio's payroll, 12% of its sales and 50% of its property were in Alaska. At the same time, Sohio indicated in its 1980 annual report that over 90% of its total oil production derived from the reserves in Alaska. [Record 1559] A media report offered by the state, with which the oil companies did not take issue, indicated that Alaskan oil had elevated Sohio from seventeenth to seventh in earnings in the oil industry:

> Once severely short of crude, Sohio's bonanza from its huge reserves of Alaskan oil skyrocketed 1979 profits to $1.2 billion, a phenomenal 2,200% blast in just one decade.[29]

Clearly the traditional formula apportionment method would inadequately reflect the phenomenal value of the companies' oil reserves in Alaska.

### III. SUMMARY JUDGMENT WAS PROPER

■ The oil companies argue that there are numerous disputed issues of fact which preclude summary judgment for the state. Several of the alleged disputed issues of fact are irrelevant to the constitutional challenge and do not preclude summary judgment.[30] Other claims by the oil companies reduce to the assertion that the characterization of the Oil Tax as a separate accounting methodology is a disputed issue of fact. The state argues that the question as to whether the Oil Tax is a form of separate accounting is a question of law. We agree with the state that a trial is not required in this case. The characterization of the Oil Tax is at most a "legislative fact" which is not the type of factual issue for which trial is necessary. *See State v.*

*Erickson,* 574 P.2d 1, 4–6 (Alaska 1978). As the trial court held, "the asserted issues of material fact do not preclude summary judgment in any event because they are facts only in the sense that they provide premises in the process of legal reasoning. They are not that type of fact for which a trial is mandated."

■ Finally, the oil companies claim that it is a disputed issue of fact whether the Oil Tax results in double taxation because it reaches income earned outside Alaska. An income attribution method, be it single-factor or three-factor formula apportionment or separate accounting, is not constitutionally invalid merely because it may result in taxation of some income that did not have its source in the state. *See Moorman Manufacturing v. Bair,* 437 U.S. 267, 272, 98 S.Ct. 2340, 2344, 57 L.Ed.2d 197, 204 (1978). Even if facts demonstrate that the Oil Tax reaches income earned outside Alaska, as alleged by the oil companies, the statute will be stricken only upon "clear and cogent evidence" that the income Alaska attributes to itself is "out of all appropriate proportions to the business transacted in [the] State," or has "led to a grossly distorted result." *Container Corp. of America v. Franchise Tax Board,* 463 U.S. at 170, 103 S.Ct. at 2942, 77 L.Ed.2d at 556 (citations omitted). Nothing in the record demonstrates that the Oil Tax led to a "grossly distorted result" or that it is "out of all appropriate proportions" to the business of extracting billions of barrels of oil from reserves located within Alaska.

Disposition by summary judgment was appropriate in this case because no issue of material fact remained. The record provided the trial judge with a sufficient background to reach a decision.[31] *See Kelly v.*

---

**29.** *Investing a Mountain of Cash Before the Oil Runs Out: An Oil Giant's Dilemma,* Bus. Wk. 60 (August 25, 1980). [Record 684]

**30.** For example, whether the oil companies had, themselves, measured their income by methods similar to those used by the Oil Tax is irrelevant.

**31.** An extensive record was developed, which is divisible into three categories. First, the bulk of the record consists of the legislative history of the Oil Tax. Second, competing affidavits from various economists and accountants present divergent economic theories on how oil production income is generated, and how, as a matter of policy, it should be divided among the states for taxation purposes. Finally, a large number

*Zamarello,* 486 P.2d 906, 914 (Alaska 1971); *cf. Ault v. Alaska State Mortgage Association,* 387 P.2d 698, 701–02 (Alaska 1963).

## IV. CONSTITUTIONAL CHALLENGES TO THE OIL TAX

### A. *Background*

When state corporate income taxes were first adopted,[32] separate accounting was regarded as the most precise method for dividing the income of a multistate corporation for taxation purposes.[33] Although apportionment formulas were employed by states and their use approved by the United States Supreme Court,[34] separate accounting was initially viewed as a benchmark by which to judge the reasonableness of state apportionment formulas. Thus, in *Hans Rees' Sons, Inc. v. North Carolina,* 283 U.S. 123, 128, 51 S.Ct. 385, 387, 75 L.Ed. 879, 905 (1931), the Supreme Court invalidated a state's apportionment formula under federal due process because the taxpayer showed that under separate accounting only 17% of the income was attributable to the state, whereas under the apportionment formula used, the state taxed from 66% to 85% of the corporation's income.

The use of separate accounting as a basis for challenging state formula apportionment methods was eventually rejected in *Butler Brothers v. McColgan,* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942). There, the Court acknowledged that an apportionment formula could be invalidated only if the taxpayer established by clear and cogent evidence that the formula taxed extraterritorial values. The Court held that the fact that no net income would be attributable to the state under separate

accounting was insufficient to invalidate an apportionment formula.

It is true that appellant's separate accounting system for its San Francisco branch attributed no net income to California. But ... [that] does not prove appellant's assertion that extraterritorial values are being taxed.

315 U.S. at 507, 62 S.Ct. at 704, 86 L.Ed. at 996.

The Court developed the doctrine that if a multi-state business is unitary, then the use of a formula apportionment method by the state is presumptively valid.[35] In the instant litigation, all of the companies involved are unitary businesses. Thus, it is undisputed that the use of an apportionment formula would have been a permissible means of attributing a portion of the companies' income to Alaska.

This case presents an interesting twist on previous constitutional challenges to state taxation methods by corporate taxpayers.

In the past, apportionability often has been challenged by the contention that income earned in one State may not be taxed in another if the source of the income may be ascertained by separate geographical accounting.

*Mobil Oil v. Commissioner of Taxes,* 445 U.S. at 438, 100 S.Ct. at 1232, 63 L.Ed.2d at 521. Conversely, in this litigation, the oil companies seek to defeat Alaska's separate accounting method by arguing that formula apportionment is *required* for unitary businesses. In recent years, the Court's endorsement of formula apportionment as the preferred method to divide income of a unitary business has become increasingly apparent.[36] However, we do not interpret

---

of affidavits submitted by the companies describe the various activities associated with oil production which occur outside Alaska.

**32.** Wisconsin adopted the first corporate income tax in 1911. J. Hellerstein, *supra* note 7, ¶ 1.2, at 5.

**33.** *Id.* ¶ 8.3, at 324.

**34.** *Underwood Typewriter v. Chamberlain,* 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165 (1920).

**35.** *See* J. Hellerstein, *supra* note 7, ¶ 8.7, at 338–343.

**36.** *See, e.g., Exxon v. Wisconsin Dep't of Revenue,* 447 U.S. 207, 229–30, 100 S.Ct. 2109, 2123–2124, 65 L.Ed.2d 66, 85 (1980); *Mobil Oil v. Commissioner of Taxes,* 445 U.S. 425, 446, 100 S.Ct. 1223, 1236, 63 L.Ed.2d 510, 526 (1980).

this preference as being a constitutional ruling that formula apportionment *must* be employed in lieu of separate accounting.

While separate accounting is not constitutionally required,[37] and while it may have some weaknesses when applied to some unitary businesses,[38] this methodology has not been rejected as unconstitutional. The United States Supreme Court in *Container Corp.* concluded that:

> Both geographical accounting and formula apportionment are imperfect proxies for an ideal which is not only difficult to achieve in practice, but difficult to describe in theory....
>
> ....
>
> But we see no evidence demonstrating that the margin of error (systematic or not) inherent in the three-factor formula is greater than the margin of error (systematic or not) inherent in ... separate accounting....

463 U.S. at 182, 183–84, 103 S.Ct. at 2949, 2949–2950, 77 L.Ed.2d at 564, 565.

### B. *Due Process*

The oil companies claim that the Oil Tax is unconstitutional because it taxes extraterritorial values. They claim that the state impermissibly taxes all of their production income from Alaska oil, despite the contributions that other states have made to those earnings in terms of research, management and sales.

■ "As a general principle, a state may not tax value earned outside its borders." *Earth Resources v. State, Department of Revenue,* 665 P.2d 960, 966 (Alaska 1983) (quoting *ASARCO v. Idaho State Tax Commission,* 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787, 794 (1982)); *Container Corp. of America v. Franchise Tax Board,* 463 U.S. at 164, 103 S.Ct. at

2940, 77 L.Ed.2d at 552. Any attempt to tax extraterritorial values would be an unconstitutional taking of property under the due process clause.[39]

■ Due process imposes two requirements before a state may tax income generated in interstate commerce. First, a "minimal connection" must exist between the interstate activities and the taxing state. Second, the income attributed to the taxing state must bear a rational relationship to intrastate values of the enterprise. *Exxon v. Wisconsin Department of Revenue,* 447 U.S. 207, 219–220, 100 S.Ct. 2109, 2118–2119, 65 L.Ed.2d 66, 79 (1980); *Mobil Oil v. Commissioner of Taxes,* 445 U.S. at 436–37, 100 S.Ct. at 1231–1232, 63 L.Ed.2d at 520; *Moorman Manufacturing v. Bair,* 437 U.S. at 272–73, 98 S.Ct. at 2343–2345, 57 L.Ed.2d at 204.

■ The first requirement—a minimal connection—is established if the corporation "avails itself of the 'substantial privilege of carrying on business' within the State." *Exxon v. Wisconsin Department of Revenue,* 447 U.S. at 220, 100 S.Ct. at 2118, 65 L.Ed.2d at 79 (quoting *Mobil,* 445 U.S. at 437, 100 S.Ct. at 1231, 63 L.Ed.2d at 520, quoting *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444–45, 61 S.Ct. 246, 249–250, 85 L.Ed. 267, 271 (1940)). Clearly, a nexus exists between the oil production and transportation activities of ARCO, Exxon, and Sohio, and the State of Alaska.

As to the second requirement, the United States Supreme Court has not required absolute precision in determining a state's share of interstate income. In *Moorman Manufacturing v. Bair,* 437 U.S. 267, 98 S.Ct. at 2340, 57 L.Ed.2d 197, an animal feed company which manufactured its product in Illinois and sold it in Iowa challenged the constitutionality of Iowa's statu-

---

**37.** *See Mobil,* 445 U.S. at 438, 100 S.Ct. at 1232, 63 L.Ed.2d at 521; *Exxon v. Wisconsin Dep't of Revenue,* 447 U.S. at 223, 100 S.Ct. at 2120, 65 L.Ed.2d at 81.

**38.** *See Mobil,* 445 U.S. at 438, 100 S.Ct. at 1232, 63 L.Ed.2d at 521; *Earth Resources v. State, Dep't of Revenue,* 665 P.2d 960, 966 (Alaska 1983).

**39.** The due process clause of the fourteenth amendment provides in part:

> [N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

tory apportionment formula. Instead of the typical three-factor (payroll, property and sales) formula, Iowa used a single-factor formula based exclusively on sales. The corporation argued that this formula resulted in extraterritorial taxation and violated the due process and commerce clauses of the federal Constitution. In addressing the rational relationship requirement, the Supreme Court stated:

> States have wide latitude in the selection of apportionment formulas and ... a formula-produced assessment will only be disturbed when the taxpayer has proved by "clear and cogent evidence" that the income attributed to the State is in fact "out of all appropriate proportion to the business transacted ... in that State," or has "led to a grossly distorted result."

437 U.S. at 274, 98 S.Ct. at 2345, 57 L.Ed.2d at 205 (citations omitted). The Court found the taxpayer had failed to demonstrate any arbitrary result in its case, and thus the tax survived the due process challenge.

More recently the United States Supreme Court has expressly refused to constitutionally require a particular income attribution method to the exclusion of all others. In *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545, the Supreme Court upheld California's inclusion of the income of Container Corporation's foreign subsidiaries in the state's apportionment formula. The corporation argued that inclusion of this income violated both the due process and commerce clauses, because the same income California was subjecting to apportionment was taxed by foreign jurisdictions under a separate accounting methodology. In rejecting this argument, the Court noted:

> In the case of a more-or-less integrated business enterprise operating in more than one State, ... arriving at precise territorial allocations of "value" is often an elusive goal, both in theory and in

practice. For this reason and others, *we have long held that the Constitution imposes no single formula on the States,* and that the taxpayer has the "distinct burden of showing by 'clear and cogent evidence' that [the state tax] results in extraterritorial values being taxed...."

> One way of deriving locally taxable income is on the basis of formal geographical or transactional accounting [separate accounting].

463 U.S. at 164, 103 S.Ct. at 2939, 77 L.Ed.2d at 552–53 (citations omitted, emphasis added).

■ We hold that the Oil Tax satisfies the second requirement of the due process clause. It makes a reasonable attempt to attribute only that income to Alaska that was generated in Alaska, while excluding expenses and profits generated beyond Alaska's borders. Under a separate accounting approach, income is viewed as earned when and where the principal operating activity occurs. Support activities are universally accounted for only as expenses, whether they occur in or outside the income-producing state. As with other states' separate accounting methods, the Oil Tax allows for the deduction of costs and profits from marketing, refining and transportation, and expenses related to other support activities.[40] Moreover, Alaska's tax is unique in allowing a deduction for out-of-state profits as well as costs of general overhead and administrative activities incident to Alaskan oil production and transportation, if the companies report them as such. *See* 15 AAC 21.290(b) (Eff. 2/22/79, am. 3/26/82). By allowing all of these deductions, the Oil Tax is intended to tax only those profits associated with the companies' activities within the state. Thus, the Oil Tax taxes only a portion of the companies' income, although by a technique quite different from formula apportionment.[41] Because the Oil Tax operates

---

**40.** *See* La. Income Tax Reg. art. 47:244.A (1985); Miss.Code Ann. § 27–7–23(b)(3) (1983); Okla. Stat.Ann. tit. 68, § 2358, A.4.a, b, c (1985); *see*

also *Webb Resources v. McCoy*, 194 Kan. 758, 401 P.2d 879, 890 (1965).

**41.** *See Container Corp.*, 463 U.S. at 188, 103 S.Ct. at 2952, 77 L.Ed.2d at 568 (Formula apportion-

to tax only a portion of the companies' income, we hold that it satisfies the dual requirements of due process.

## C. Commerce Clause

■ We have previously recognized that the commerce clause [42] "places restraints upon the taxing power of states similar to those of the due process clause. In fact, these two constitutional limits overlap to a great extent." *Sjong v. State, Department of Revenue*, 622 P.2d at 973. Generally, if a state tax "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce and is fairly related to the services provided by the State," there is no impermissible burden on interstate commerce. *Complete Auto Transit v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326, 331 (1977). The nexus and fair apportionment factors have been discussed in the previous due process section. We now turn to a consideration of the other two factors of the *Complete Auto Transit* test.

The oil companies contend that the Oil Tax violates the commerce clause because it inevitably results in overlapping or duplicative taxation, thus discriminating against businesses engaged in interstate commerce. They claim that recent United States Supreme Court decisions on the subject of multiple taxation render the Oil Tax unconstitutional, citing *Japan Line v. County of Los Angeles*, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), *Mobil Oil v. Commissioner of Taxes*, 445 U.S. 425, 100 S.Ct. at 1223, 63 L.Ed.2d 510, and *Exxon v. Wisconsin Department of Revenue*, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66. We disagree.

In *Japan Line*, six Japanese companies challenged a California property tax on shipping containers. The Japanese-owned containers were subject to a property tax

on 100% of their value in their home port of Japan. Under California's tax, all containers in the state on a specified tax day were subject to an apportioned *ad valorem* property tax. The companies contended that California's tax, as applied to their containers, created multiple taxation and violated the commerce clause.

The Court in *Japan Line* assumed that the *Complete Auto Transit* test was met. However, because taxation of instrumentalities of foreign commerce was at issue, the Court found it necessary to inquire whether California's tax, notwithstanding its fair apportionment, created a substantial risk of international multiple taxation. 441 U.S. at 451, 99 S.Ct. at 1823, 60 L.Ed.2d at 349. In this regard, the Court contrasted taxation of interstate instrumentalities with that of international instrumentalities:

> In order to prevent multiple taxation of interstate commerce, this Court has required that taxes be apportioned among taxing jurisdictions, so that no instrumentality of commerce is subjected to more than one tax on its full value. The corollary of the apportionment principle, of course, is that no jurisdiction may tax the instrumentality in full. "The rule which permits taxation by two or more states on an apportionment basis precludes taxation of all of the property by the state of the domicile. . . . Otherwise there would be multiple taxation of interstate operations." The basis for this Court's approval of apportioned property taxation, in other words, has been its ability to enforce full apportionment by all potential taxing bodies.

441 U.S. at 446–47, 99 S.Ct. at 1820–1821, 60 L.Ed.2d at 347 (citations omitted). While the Court could require apportionment among the states for property taxation purposes, it obviously could not prevent Japan from taxing 100% of the value

ment and separate accounting are "two distinct methods of allocating the income of a multinational enterprise.").

**42.** The commerce clause is set forth in article I, § 8 of the United States Constitution:

The Congress shall have Power To ... regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes; ...

of the containers. The Court held California's nondiscriminatory tax unconstitutional because it resulted in actual multiple taxation of instrumentalities of international commerce.[43]

■ The oil companies in the present litigation argue that if Alaska had been the home port instead of Japan in *Japan Line*, the Supreme Court would have invalidated Alaska's 100% *ad valorem* tax. We agree that Alaska would not be entitled to apply a property tax to the full value of instrumentalities of foreign commerce. But the oil companies' attempt to equate a property tax on the full value of goods used in foreign commerce with the Oil Tax is inappropriate. While the single situs property tax may be analogous to the specific allocation by situs method of income taxation, it is a totally different species from separate accounting.[44] The Oil Tax, as a separate accounting division-of-income method, does not automatically conflict with an apportionment method and result in double taxation.[45] Because separate accounting and formula apportionment can coexist without overlapping tax bases, *Japan Line* does not require invalidation of the Oil Tax.[46]

In *Mobil Oil v. Commissioner of Taxes*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510, the Court upheld the constitutionality of the inclusion of foreign source dividend income in the total income subject to taxation by Vermont. Mobil argued that Vermont could not tax its dividend income because New York, the state of commercial domicile, had the power under the commerce clause to allocate all of the dividend income to itself. Allowing Vermont to tax a share of the income by apportionment would, therefore, result in double taxation if New York implemented such a tax. In this situation, the Court considered the risk of multiple taxation to be sufficient since the specific allocation by situs method was "theoretically incommensurate" with apportionment.[47] The Court found that if one method were constitutionally preferable, a tax based on the other method could not be sustained. 445 U.S. at 444–45, 100 S.Ct. at 1235–1236, 63 L.Ed.2d at 525.

Instead of accepting Mobil's argument that specific allocation by situs was preferable, the Court found apportionment to be the better approach. While the Court chose not to rule on the constitutionality of a hypothetical New York tax, the Court stated that in theory New York could not exclusively tax Mobil's dividend income since

> the dividends reflect income from a unitary business, part of which is conducted in other states. In that situation, the income bears relation to benefits and privileges conferred by several states. These are the circumstances in which apportionment is *ordinarily* the accepted method.

*Id.* at 446, 100 S.Ct. at 1236, 63 L.Ed.2d at 526 (emphasis added).

Several months after the *Mobil* case, the Court decided *Exxon v. Wisconsin Department of Revenue*, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66. *Exxon*, like this litigation, involved state taxation of oil pro-

---

**43.** The Court indicated that it need not decide "under what circumstances the mere *risk* of multiple taxation would invalidate a state tax, or whether this risk would be evaluated differently in foreign, as opposed to interstate, commerce." 441 U.S. at 452 n. 17, 99 S.Ct. at 1823 n. 17, 60 L.Ed.2d at 350 n. 17 (emphasis in original).

**44.** *See* discussion *supra* section II.A.2.

**45.** *Container Corp.,* 463 U.S. at 194–95, 103 S.Ct. at 2955–2956, 77 L.Ed.2d at 572.

**46.** There is language in *Japan Line* to the effect that an "unapportioned" tax will not be sus-

tained. 441 U.S. at 447, 99 S.Ct. at 1820, 60 L.Ed.2d at 347. However, this statement must be read in context. In the property tax area, separate accounting is not even a viable theory for dividing income. Allocation of the full property to one state or apportionment among several states are the only two options. Since allocation of the full property value to one of several proper taxing jurisdictions is unconstitutional, apportionment is the only permissible means of dividing the value of property used in interstate commerce for property taxation purposes.

**47.** *Cf. Moorman,* 437 U.S. at 277, 98 S.Ct. at 2346, 57 L.Ed.2d at 207.

duction income. Exxon's activities in Wisconsin were limited to the marketing of petroleum products. Exxon challenged Wisconsin's inclusion of oil production income in the income subject to apportionment by Wisconsin. Exxon argued that production of oil and marketing of oil were two distinct operations. In Exxon's view, since it could illustrate by separate accounting that these two activities were distinct, Wisconsin could not constitutionally include production income in the tax base for apportionment.

Exxon contended that the commerce clause required the allocation of all income derived from exploration and production functions to the situs state, rather than inclusion in the apportionment formula. Exxon asserted that since the producing state was constitutionally entitled to allocate all production income to itself, nonproducing states could not tax an apportioned share of this same income.

To this, the Supreme Court replied:

> We do not agree. As was the case with income from intangibles, there is nothing "talismanic" about the concept of situs for income from exploration and production of crude oil and gas. Presumably, the States in which appellant's crude oil and gas production is located are permitted to tax in some manner the income derived from that production, there being an obvious nexus between the taxpayer and those States. However, "there is no reason in theory why that power should be exclusive when the [exploration and production income as distinguished through separate functional accounting] reflect[s] income from a unitary business, part of which is conducted in other States. In that situation, the income bears relation to benefits and privileges conferred by several States. These are the circumstances in which

apportionment is ordinarily the accepted method."

In short, the Commerce Clause does not require that any income which a taxpayer is able to separate through accounting methods and attribute to exploration and production of crude oil and gas be allocated to the States in which those production centers are located. *The geographic location of such raw materials does not alter the fact that such income is part of the unitary business of the interstate enterprise and is subject to fair apportionment among all States to which there is a sufficient nexus with the interstate activities of the business.*

447 U.S. at 229–30, 100 S.Ct. at 2123–2124, 65 L.Ed.2d at 85 (emphasis added; citations omitted).

Basically, both the oil companies and the state view *Japan Line, Mobil* and *Exxon* as prohibiting allocation of oil production income entirely to the situs state. The debate focuses on whether the Oil Tax allocates all oil production income to Alaska, as the oil companies contend, or is instead a distinct method of dividing the production income, as the state contends. Because we hold that the Oil Tax is a distinct method of dividing oil production income by use of separate accounting, its constitutional validity is not directly determined by these three cases.[48]

While *Mobil* and *Exxon* indicate the Court's strong endorsement of the use of apportionment formulas, the Court clearly implied that the use of separate accounting is constitutionally permissible under the commerce clause.[49] The constitutional preference for apportionment of "unitary" dividend income in *Mobil* stemmed from the fact that the two competing methods at issue—specific allocation and formula apportionment—were "theoretically incom-

---

**48.** *See* W. Hellerstein, Memorandum to Mr. Milton Barker (April 20, 1981) (discussing proposed Oil Tax). [Record 17,091]

**49.** In both *Exxon* and *Mobil,* the Court stated that separate accounting "is not constitutionally required." *Exxon,* 447 U.S. at 223, 100 S.Ct. at 2120, 65 L.Ed.2d at 81; *Mobil,* 445 U.S. at 438, 100 S.Ct. at 1232, 63 L.Ed.2d at 521.

mensurate." *Mobil*, 445 U.S. at 444, 100 S.Ct. at 1235, 63 L.Ed.2d at 525.[50]

The type of duplicative taxation found unacceptable in *Japan Line, Exxon* and *Mobil* all involved one taxing jurisdiction using the specific allocation by situs method, while another used apportionment. In other words, one taxing jurisdiction taxed the whole pie, while another taxed a slice. In such a situation, double taxation is inevitable, and one method has to be chosen over another. By contrast, in *Moorman Manufacturing v. Bair*, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197, two jurisdictions used different apportionment formulas. Each took only a slice of the pie, but since they used different formulas to divide the pie, the Court recognized that there was high probability of some overlap. While the potential for overlap existed, it certainly was not inevitable, and the Court upheld Iowa's apportionment method. The Court held that prevention of duplicative taxation should be effected by a national uniform rule for the division of income, but that the "Constitution . . . is neutral with respect to the content of any uniform rule." *Id.* at 279, 98 S.Ct. at 2347, 57 L.Ed.2d at 208. Given the absence of federal legislation, the Court was unwilling to specify that a particular methodology was constitutionally preferable. While acknowledging a clear risk of multiple taxation in a variety of situations due to the divergence in division-of-income techniques employed by the various states, the Court found such risk preferable to choosing one technique as constitutionally superior to another. *Id.* at 278–80, 98 S.Ct. at 2347–2348, 57 L.Ed.2d at 207–09.

The oil companies in the present litigation acknowledge that *Moorman* evidenced the Supreme Court's high degree of tolerance for apportionment formulas. But in their view, this tolerance does not extend beyond the apportionment method. They claim that *Moorman* does not sanction the use of Alaska's Oil Tax because the tax is not apportioned. We disagree. First, as we have previously explained, the Oil Tax

utilizes a division-of-income method. Second, while *Moorman* pertained to the conflict presented when two jurisdictions employ different types of formula apportionment, the principle of the opinion was that non-uniform state taxes are inevitable and constitutionally permissible. Since *Moorman*, the Court has continued to maintain that states enjoy broad leeway in their choice of division-of-income methods. *See Container Corp. of America v. Franchise Tax Board*, 463 U.S. at 164, 103 S.Ct. at 2939, 77 L.Ed.2d at 552.

*Container Corp.* closely resembles the situation in this case. In *Container Corp.*, California sought to determine its share of total income by use of formulary apportionment, while foreign jurisdictions employed separate accounting.[51] Discussing discrimination against interstate commerce, the Court reiterated its view that the Constitution does not require the elimination of all overlapping taxation on the interstate level. 463 U.S. at 171, 103 S.Ct. at 2943, 77 L.Ed.2d at 557. Thus, if the problem were limited to the interstate level, "the fact that different jurisdictions applied different methods of taxation . . . would probably make little constitutional difference." 463 U.S. at 185, 103 S.Ct. at 2950, 77 L.Ed.2d at 566.

In *Container Corp.*, the Court faced the additional complication of international commerce. Even so, the Court upheld the tax, distinguishing *Japan Line* on the ground that Japan's specific allocation by situs method necessarily resulted in double taxation.

Here, by contrast, we are faced with two distinct methods of allocating the income of a multi-national enterprise. The "arm's-length" approach [i.e., separate accounting] divides the pie on the basis of formal accounting principles. The formula apportionment method divides the same pie on the basis of a mathematical generalization. Whether the combination of the two methods results in the

---

**50.** *See* W. Hellerstein, *supra* note 48, at 2. [Record 17,093]

**51.** *See* discussion *supra* section IV.B.

same income being taxed twice or in some portion of income not being taxed at all is dependent solely on the facts of the individual case.

463 U.S. at 188, 103 S.Ct. at 2952, 77 L.Ed.2d at 568 (footnote omitted). The Court held that the two taxing methods do "not create an *automatic* 'asymmetry'." *Id.* at 194–95, 103 S.Ct. at 2955–2956, 77 L.Ed.2d at 572. "[I]t would be perverse, [therefore,] simply for the sake of avoiding double taxation, to require California to give up one allocation method that sometimes results in double taxation in favor of another allocation method that also sometimes results in double taxation." *Id.* at 193, 103 S.Ct. at 2955, 77 L.Ed.2d at 571. The fact that the Court found the two methods could coexist on the international level, where duplicative taxation is viewed more strictly, makes separate accounting a quite permissible alternative when only interstate commerce is involved, as is the case in the present litigation.

The Supreme Court has repeatedly recognized that neither separate accounting nor formula apportionment will result in the attribution of the exact amount of income earned in the state to that particular state. Some multiple taxation may result when one jurisdiction employs one method and another uses a different approach. This threat is inherent in any system where state attribution methods are nonuniform. But a state does not offend the commerce clause merely because its method of dividing income is different from that of its neighbors. *Moorman Manufacturing v. Bair,* 437 U.S. at 278–80, 98 S.Ct. at 2347–2348, 57 L.Ed.2d at 208–09.

We have already explained that the separate accounting method employed by the State of Alaska does not tax all profits generated from Alaskan oil production and does not impermissibly attribute extraterritorial values to Alaska. Using the leeway it retains absent a federal uniform approach, the Alaska legislature chose a con-

stitutionally permissible method of income division, albeit not the one "ordinarily" employed for most other types of unitary businesses.

█ We hold that the Oil Tax comports with the requirements of the *Complete Auto Transit* test and creates no impermissible burden on interstate commerce. The location of the oil fields in Prudhoe Bay creates a substantial "nexus" between the oil companies' activities and the State of Alaska.[52] As discussed above, the Oil Tax is fairly apportioned to represent only that part of the companies' income generated from its Alaskan activities—oil and gas production and transportation. As in *Container Corp.,* the Oil Tax does not inevitably result in multiple taxation. Moreover, any possible overlap created by Alaska's use of separate accounting and other jurisdictions' use of different income division methods is not the fault, in the constitutional sense, of Alaska. Thus, the Oil Tax does not discriminate against interstate commerce. Finally, because the oil companies all benefit from the "substantial privilege"[53] of extracting oil in Alaska, the Oil Tax is fairly related to services provided in the state.

### D. *Federal and State Equal Protection*

The oil companies assert that the Oil Tax violates both state and federal equal protection since it "arbitrarily [and] irrationally subject[s] a special group of taxpayers to treatment not accorded taxpayers at large." They argue, in effect, that using a distinct method of taxation for multistate oil companies, but not for any other unitary businesses, violates equal protection. We reject the oil companies' equal protection challenge.

The analysis under Alaska's equal protection clause involves a three-step process. *Alaska Pacific Assurance v. Brown,* 687 P.2d 264, 269–70 (Alaska 1984) [hereinafter

---

**52.** *See Exxon v. Wisconsin Dep't of Revenue,* 447 U.S. at 229, 100 S.Ct. at 2123, 65 L.Ed.2d at 85.

**53.** *See Commonwealth Edison v. Montana,* 453 U.S. at 628–29, 101 S.Ct. at 2959–2960, 69 L.Ed.2d at 901.

cited as ALPAC]; *State v. Ostrosky*, 667 P.2d 1184, 1192–94 (Alaska 1983), *appeal dismissed*, —— U.S. ——, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984); *State v. Erickson*, 574 P.2d 1, 11–12 (Alaska 1978).[54] First, in order to ascertain the appropriate level of review, the nature of the constitutional interest affected must be identified. *ALPAC*, 687 P.2d at 269. Next, the validity of the statutes' purpose must be analyzed in light of the interest impinged. *Id.* Lastly, the means chosen must be examined, also in light of the interest, to insure that they are sufficiently related to the goals of the statute. *Id.* at 269–70.

The interest involved here, freedom from disparate taxation, lies at the low end of the continuum of interests protected by the equal protection clause.[55] Regarding the statute's purpose, the oil companies claim that greed and other improper motives led the Alaska legislature to enact the Oil Tax. The state, however, has adequately established that a primary purpose of the Oil Tax was to rectify a perceived underestimation of oil production and pipeline transportation income that occurred with the application of an apportionment formula. The goal was to insure that the tax rate assessed to the oil companies on this income was commensurate with the rate applicable to the income of other corporations in the state. Ch. 110, § 1, SLA 1978. Taxing the oil companies differently to rectify a perceived inequity was the legislature's attempt to prevent disparate treatment; thus, the validity of this purpose in light of the companies' interest is established. Finally, the means chosen were sufficiently related to the goals of the legislation. The use of separate accounting, rather than formula apportionment, increased the amount of production and transportation income subject to Alaska taxation and more fairly represented the extent of the business activities of the oil companies in Alaska.

The Oil Tax did not adversely affect any fundamental interest, nor did it contain a suspect classification. Thus, to be upheld under the federal analysis, it need only to have been rationally related to a legitimate state interest. *Exxon v. Eagerton*, 462 U.S. 176, 195–96, 103 S.Ct. 2296, 2307–2309, 76 L.Ed.2d 497, 513 (1983). The rational basis standard is particularly easy to meet in the area of taxation. The United States Supreme Court has stated that "[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes." *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 547, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129, 138 (1983). The Oil Tax clearly bore a rational relationship to the state's goal of correcting a perceived inequity in the tax structure.

■ While the oil companies dispute the underlying premise that the Oil Tax rectifies inequities, the legislature could have reasonably concluded that the Oil Tax would more accurately compute the companies' income generated in Alaska. Thus, the Oil Tax survives the equal protection challenge, under both the United States and the Alaska Constitutions.

### E. *Contract Clause*

■ The oil companies argue that the Oil Tax is invalid because it impairs the obligation of the state's lease contracts with them.[56] They contend that the tax increases the state's share under the lease

---

**54.** In determining questions of equal protection under the Alaska Constitution, we employ a single test. As we stated in *State v. Erickson*, 574 P.2d 1, 12 (Alaska 1978):

> Such a test will be flexible and dependent upon the importance of the rights involved. Based on the nature of the right, a greater or lesser burden will be placed on the state to show that the classification has a fair and substantial relation to a legitimate governmental objective.

**55.** *See Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 547, 103 S.Ct. 1997,

2002, 76 L.Ed.2d 129, 138 (1983). *See generally* P. Hartman, *supra* note 8, § 3.1, at 131–38.

**56.** The State of Alaska began issuing oil and gas leases a few months after passage of the Alaska Land Act, as 38.05, in 1959. The first oil and gas leases at Prudhod Bay were issued in 1964 the state entered into lease contracts with the oil companies, whereby the state sold the companies whatever gas and oil might be found on the leaseholds in exchange for "bonus" payments and royalties of 12½%.

contracts, and that such modification of the terms of the leases violates the contract clause of the United States Constitution.[57]

This argument is without merit. No lease provision has been impaired. In entering into the leases the state could not,[58] and did not, contract away its power as a sovereign to tax income earned in the state. *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) disposes of this issue:

> Contractual arrangements remain subject to subsequent legislation by the presiding sovereign. Even where the contract at issue requires payment of a royalty for a license or franchise issued by the governmental entity, the government's power to tax remains unless it "has been specifically surrendered in terms which admit of no other reasonable interpretation." *St. Louis v. United R. Co.,* 210 U.S. 266, 280, 28 S.Ct. 630, 634, 52 L.Ed. 1054, 28 S.Ct. 630 (1908).

455 U.S. at 148, 102 S.Ct. at 907, 71 L.Ed.2d at 36 (citations omitted); *see also Exxon v. Eagerton,* 462 U.S. at 187–94, 103 S.Ct. at 2304–2307, 76 L.Ed.2d at 508–12.

### VIII. RETROACTIVITY OF THE OIL TAX

The Oil Tax Act was signed into law on July 8, 1978.[59] Section 4 of the Act provided that it would apply retroactively to January 1, 1978. Section 5 provided the Act would be "effective" immediately. While the Senate voted 16 to 4 to approve section 5, the entire Oil Tax Act only passed by a vote of 11 to 9. Thus, at no time did more than 11 senators vote to approve section 4.

The companies argue that the Act may not constitutionally be made applicable to income earned prior to July 8, 1978. They interpret article II, § 18 of the Alaska Constitution [60] and AS 01.10.070(a) [61] as requiring the approval of two-thirds majority of each house of the legislature to give retroactive effect to a new law. The companies argue that even though a two-thirds vote was attained for an immediate effective date, a two-thirds vote was also required to enact section 4, applying the Act retroactively to January 1, 1978. We disagree.

AS 01.10.090 states that "[n]o statute is retrospective unless expressly declared therein." A two-thirds vote requirement does not appear in that section, nor elsewhere in Alaska law. The legislature, however, has recognized that where retroactive application of a portion or all of a bill is desired, an immediate effective date, which does require a two-thirds vote under article II, § 18 and AS 01.10.070(a), should be used in conjunction with the retroactivity section. Legislative Affairs Agency, *Manual of Legislative Drafting* 11 (1977); Uniform Rules of the Alaska State Legislature, Rule 10 (May 3, 1977). Accordingly, because two-thirds of the legislature voted to make the Oil Tax Act immediately effective, a separate two-thirds vote for the Act to be retroactive was not constitutionally required. The Oil Tax was properly retroactive to January 1, 1978.

The superior court's action in granting the state's motion for summary judgment is AFFIRMED.

COMPTON, J., not participating.

### APPENDIX 1

AS 43.21, Oil and Gas Corporate Income Tax provided:

Sec. 43.21.010. Application [Repealed effective January 1, 1982]. AS 43.21.010—

---

**57.** "No State shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. Const., art. I, § 10, cl. 1.

**58.** The Alaska Constitution provides: "The power of taxation ... shall not be ... contracted away, except as provided in this article." Alaska Const. art. IX, § 1.

**59.** Ch. 110, SLA 1978.

**60.** Alaska Const. art. II, § 18 provides:
Laws passed by the legislature become effective ninety days after enactment. The legislature may, by concurrence of two-thirds of the membership of each house, provide for another effective date.

**61.** AS 01.10.070(a) contains language paralleling Alaska Const. art. II, § 18.

43.21.120 applies to every corporation doing business in the state which derives income from the production of oil or gas from a lease or property in the state or from the pipeline transportation of oil or gas in the state. The tax calculated under AS 43.21.-010—43.21.120 is measured by the total taxable income of the corporation during the tax period as determined under AS 43.21.020—43.21.040 and is calculated at the rates established under AS 43.20.011(e).

Sec. 43.21.020. Determination of taxable income from oil and gas production [Repealed effective January 1, 1982]. (a) The taxable income of a corporation from the production of oil and gas from a lease or property in the state shall be the corporation's net income as calculated by the department in accordance with this section.

(b) Gross income of a corporation from oil and gas production shall be the gross value at the point of production of oil or gas produced from a lease or property in the state. The department shall by regulation determine a uniform method of establishing the gross value at the point of production. In making its determination the department may use the actual prices or values received for the oil or gas, the posted prices for the oil or gas in the same field, or the prevailing prices or values of oil or gas in the same field. In addition, in its determination of gross value at the point of production of oil or gas produced from a lease or property, the department shall determine the reasonable costs of transportation from the point of sale to the point of production of the oil or gas. Transportation costs set by a tariff properly on file with the Alaska Pipeline Commission or other regulatory agency shall be considered prima facie reasonable, but if a tariff properly on file with a regulatory agency is subsequently amended, changed, or overturned retroactively, the reasonable costs of transportation shall be recomputed for that period using the newly determined tariff.

(c) Net income from oil and gas production shall be determined by the department by deducting from gross income the following:

(1) royalties paid in kind or in value;

(2) taxes imposed under AS 43.55.011–43.55.150 and AS 43.57.010 which are actually paid or incurred by the corporation on the production from a lease or property in the state;

(3) taxes imposed under AS 43.56.010–43.56.210 and AS 29.53.010–29.53.460 which are actually paid or incurred by the corporation on property used directly in the production of oil or gas from a lease or property in the state, including property used in production, gathering, treatment, or preparation of the oil or gas for pipeline transportation, but only if those property tax payments were due and payable only after the date of commercial production from the lease or property with which the property was associated;

(4) the direct costs incurred by or for the corporation in operating the lease or property, including the direct costs of producing, gathering, treating, or preparing the oil or gas for pipeline transportation, but not of any payments received for those activities and not including any indirect cost or overhead expense;

(5) depreciation (using the unit of production method or such other reasonable methods as the department may by regulation establish) on property used directly in the production, gathering, treatment, or preparation of the oil or gas for pipeline transportation including amortization of capitalized interest for investments in this property at a rate not to exceed the average cost of borrowed capital to the taxpayer during the year in which it is capitalized;

(6) the amortization of lease acquisition payments and taxes paid or incurred under AS 43.56.010–43.56.210 and AS 29.-53.010–29.53.460 (including capitalized interest on both) for or on producing properties before the commencement of commercial production from the lease or property for which the property is being used;

(7) interest expense of the corporation not capitalized during construction, that was paid or incurred in connection with property in Alaska; however, unless (f) of this section applies, the interest expense may not exceed that portion of the total interest paid by the consolidated business of which the corporation is a part, determined by multiplying the total interest by a fraction, the numerator of which is the value of the corporation's real and tangible personal property used directly in the production of oil or gas from a lease or property in the state and the denominator of which is the value of all real and tangible personal property of the consolidated business; in this subsection, "total interest paid by the consolidated business" does not include interest expense arising from intercompany obligations within the consolidated business except to the extent that the interest expense reflects a pass-through of interest on a third-party borrowing by the parent or other member of the consolidated business with the purpose, expressed at the time of the third-party borrowing, of financing Alaska business activity of the taxpayer corporation;

(8) expenses incurred by the corporation after December 31, 1977, of unsuccessful exploration of oil or gas in the state including the acquisition costs of abandoned properties, dry hole costs, and the costs of geologic and geophysical exploration related to those abandoned properties;

(9) general overhead or administrative expense incurred by the corporation attributable to deriving income from the production of oil or gas from a lease or property in the state to the extent, except as provided in (f) of this section, that it does not exceed that portion of the total general overhead or administrative expense incurred by the consolidated business of which the corporation is a part, determined by multiplying the total general overhead or administrative expense by a fraction, the numerator of which is the value of the corporation's real and tangible personal property used

directly in the production of oil or gas from a lease or property in the state and the denominator of which is the value of all real and tangible personal property of the consolidated business;

(10) the amount of income from the production of oil and gas from a lease or property that is divided among the regional Native corporations under sec. 7(i) of the Alaska Native Claims Settlement Act. (P.L. 92–203);

(11) the tax imposed by sec. 4986 of the Internal Revenue Code that is paid or incurred by the taxpayer for oil production from leases or properties in the state.

(d) Deductions from gross income under this section shall not include expenses previously deducted on a return filed under AS 43.20.011–43.20.350.

(e) Where a corporation subject to AS 43.21.010–43.21.120 shares the production or proceeds of the production from a lease or property through a working interest, royalty interest, overriding royalty interest, production payment, net profit interest, joint venture or other agreement, the department shall allocate the deductions from gross income between the corporation and the persons with whom it has such an agreement in accordance with the terms of the agreement.

(f) If a corporation demonstrates to the satisfaction of the department that it paid or incurred actual expenses for interest or for general overhead or administration attributable to deriving income from the production of oil or gas from a lease or property in the state in an amount greater than the amount determined under (c)(7) or (c)(9) of this section, the department may allow the corporation to deduct the greater amount.

Sec. 43.21.030. Determination of income from oil and gas pipeline transportation [Repealed effective January 1, 1982]. (a) Except as provided in (c) of this section, taxable income attributable to the transportation of oil in a pipeline engaged in interstate commerce in Alaska shall be deter-

mined by the department and shall be the amount reported or that would be required to be reported to the Federal Energy Regulatory Commission or its successors as net operating income, less those portions of interest and general administrative expense attributable to the pipeline transportation of oil in the state, except that taxable income shall also include taxes on or measured by income. The department shall establish regulations governing the determination of interest and general administrative expense attributable to pipeline transportation of oil in the state.

(b) Except as provided in (c) of this section, taxable income attributable to the transportation of natural gas in a pipeline engaged in interstate commerce in Alaska shall be determined by the department and shall be the amount reported or that would be required to be reported to the Federal Energy Regulatory Commission as net operating income less that portion of interest and general administrative expense attributable to pipeline transportation in the state, except that the taxable income shall also include taxes on or measured by income. The department shall establish regulations governing the determination of interest and general administrative expense attributable to pipeline transportation of natural gas in the state.

(c) Taxable income attributable to the transportation of oil or natural gas in Alaska of any corporation not under the Federal Energy Regulatory Commission jurisdiction, or of a corporation under the jurisdiction of the Federal Energy Regulatory Commission but not reporting the operation of pipelines in Alaska separately from the operation of pipelines elsewhere, shall be determined by the department and shall be based upon an amount equal to that which would have been reported to the Federal Energy Regulatory Commission under (a) of this section in the case of oil pipelines, or (b) of this section in the case of natural gas pipelines, had the corporation been, in fact, under Federal Energy Regulatory Commission jurisdiction for the taxable year and required to report on the operation of Alaska pipelines separately from the operation of pipelines elsewhere.

Sec. 43.21.040. Determination of income from activities other than oil and gas production or pipeline transportation [Repealed effective January 1, 1982]. (a) Taxable income of a corporation subject to AS 43.21.010–43.21.120 from activities in this state other than the production of oil or gas from a lease or property in the state or the pipeline transportation of oil or gas in the state shall be determined in accordance with the method established in art. IV of AS 43.19.010 and in AS 43.20.071, as modified by (b)—(f) of this section.

(b) The total taxable income of the consolidated business is its entire income less the portion of that entire income attributable to worldwide production and pipeline transportation of oil and gas. In this section,

(1) for a member of a consolidated business who is required to file under the Internal Revenue Code, "entire income" means taxable income under Subtitle F and chapter 1 of Subtitle A of the Internal Revenue Code of 1954, as amended, except that those provisions adopted after December 31, 1975, which change or modify exemptions from tax are not adopted by reference as a part of this section until the second January 1 following the effective date of the federal law;

(2) for a member of a consolidated business who is not required to file under the Internal Revenue Code, "entire income" means book income, except that a taxpayer may elect to report his income as the income would be determined under (1) of this subsection.

(c) The numerator and denominator of the property factor, of the payroll factor and of the sales factor shall be calculated without reference to that portion of property, payroll or sales directly related to the production of oil or gas from a lease of property in the state or the pipeline transportation of oil or gas in the state.

(d) Repealed by § 17 ch. 116, SLA 1981.

(e) Repealed by § 17 ch. 116, SLA 1981.

(f) The value attributed to vessels transporting Alaskan oil or gas of the consolidated business which are not owned or effectively owned by the consolidated business shall be excluded from the property factor.

Sec. 43.21.050. Assessment of income and tax [Repealed effective January 1, 1982]. (a) The department shall assess taxable income and the amount of tax payable on that taxable income.

(b) On or before August 15 of each year the department shall send to every corporation taxable under AS 43.21.010–43.21.120 a notice of assessment showing the amount of income taxable under AS 43.21.010–43.21.120 for the previous year and the amount of tax payable on that taxable income.

(c) For purposes of AS 43.21.010–43.21.120 the department may combine taxable incomes of corporations subject to tax under AS 43.21.010–43.21.120 who are part of the same consolidated business.

(d) If the methods of allocation and apportionment provided in AS 43.21.010–43.21.120 do not fairly represent the extent of a corporation's business activity in the state, the corporation may petition for or the department may require, in respect to all or any part of the corporation's business activity, if reasonable, the employment of any method authorized under art. IV, sec. 18, of the Multistate Tax Compact (AS 43.19.010) to effectuate an equitable allocation and apportionment of the corporation's income. The commissioner shall include in his annual report required in AS 43.21.110 a report on all relief granted under this subsection, including for each case a statement of the changes in tax liability resulting from the granting of relief, the tax years involved, and a description of the method of determining taxable income that was substituted for those provided in AS 43.21.010–43.21.120.

Sec. 43.21.060. Returns [Repealed effective January 1, 1982]. On or before April 15 of each year, a corporation subject to tax under AS 43.21.010–43.21.120 shall submit a return in a form prescribed by the department setting out information required by the department to determine taxable income. For purposes of AS 43.21.010–43.21.120, the department may require corporations subject to tax under AS 43.21.010–43.21.120 who are part of the same consolidated business to file a single return.

Sec. 43.21.070. Payment of tax [Repealed effective January 1, 1982]. The tax levied under AS 43.21.010–43.21.120 is payable to the department on or before September 30 of each year or in installments, including prepayments of estimated tax, at the times and under the conditions the department may by regulation require. This tax is payable on the due date set out in this section even though the assessment is under appeal or the validity, enforceability or application of AS 43.21.010–43.21.120 or any provision of AS 43.21.010–43.21.120 is challenged before the department or in the courts.

Sec. 43.21.080. Transitional rules [Repealed effective January 1, 1982]. The department shall provide by regulation transition rules for corporations subject to tax under AS 43.20.011–43.20.350 before July 9, 1978 to avoid double taxation of the same income or double deduction of the same expense of those corporations as a result of becoming subject to tax under AS 43.21.010–43.21.120.

Sec. 43.21.090. Regulations [Repealed effective January 1, 1982]. The department may adopt regulations in accordance with the Administrative Procedure Act (AS 44.62.010–44.62.650) as appropriate to administer and enforce AS 43.21.010–43.21.120.

Sec. 43.21.100. Penalties [Repealed effective January 1, 1982]. The penalties established in AS 43.20.011–43.20.350 apply to AS 43.21.010–43.21.120.

Sec. 43.21.110. Public reporting [Repealed effective January 1, 1982]. (a) The commissioner of revenue shall compile and transmit to the legislature an annual consolidated report of state revenues and taxation policies under AS 43.21.010–43.21.120.

This report shall include total aggregate income tax paid by corporations covered under AS 43.21.010–43.21.120 and aggregate income and deductions by category, so classified as to prevent the identification of particular returns or reports.

(b) The legislative auditor shall transmit to the legislature an annual report reviewing the actions of the department in administering AS 43.21.010–43.21.120.

Sec. 43.21.120. Definitions [Repealed effective January 1, 1982]. Unless the context requires otherwise the definitions contained in AS 43.55.140 are applicable to AS 43.21.010–43.21.120. In addition, in AS 43.-21.010–43.21.120.

(1) "base of operations" means the closest point on land to the offshore oil or gas production operations from which goods, services and supplies flow to those offshore oil or gas production operations;

(2) "consolidated business" means a corporation or group of corporations having more than 50 per cent common ownership direct or indirect, or a group of corporations in which there is common control either direct or indirect as evidenced by any arrangement, contract or agreement.